GEKP

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

GERALD EDWARDS

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

20    307

- against -

BRAIN HESSENTHALER
CHRISTOPHER A. PIROLLI
PAUL K. LAGANA
KEVIN M. ROUSSET

_____

BUCKS COUNTY CORRECTIONAL
FACILITY RT. 611 DOYLESTOWN
PA. 18901

_____

_____

_____

**COMPLAINT**

Jury Trial: ☐ Yes   ☐ No

(check one)

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

I.    **Parties in this complaint:**

A.    List your name, address and telephone number. If you are presently in custody, include your identification number and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff    Name    _____

            Street Address    _____

            County, City    _____

            State & Zip Code    _____

            Telephone Number    _____

*Rev. 10/2009*

C. If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

Plaintiff(s) state(s) of citizenship _U.S._

Defendant(s) state(s) of citizenship _____

## III. Statement of Claim:

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A. Where did the events giving rise to your claim(s) occur? _MIDDLETOWN TOWNSHIP BUCKS CTY Pa. 19047_

B. What date and approximate time did the events giving rise to your claim(s) occur? _THE PAST 2 YRS._

C. Facts: _CONSTABLE Jim McMEEDing Pict ME UP NEVER ID ME AND took ME To MAGiCTATE DANiEL BARANOSKi I ACK To SEE A WARRANT, THEY DID NOT HAVE ONE, ALL THE MAGiSTRATE SAID: MAKE A PLEA OR go To JAiL, So I MADE A PLEA AND HE SENT ME To JAiL ANY WAY, BUT NOT UNTELL HE goT $1000.00 OF ME,_

[Box: What happened to you?]

_WHEN I ARRIVED I TOLD THE ~~PESS~~ NURSE THAT I WAS HAVING DiZZY SPELLS AND I HAD 2 INFECED TEETH AND I HAD EMPHYSEMA AND I WAS USEiNG OXYGAN & INHALERS,_

[Box: Who did what?]

_So I FILLOUT PAPES To SEE A DENISET & DOCKER BUT NEVER SEAN ONE,_

[Box: Was anyone else involved?]

[Box: Who else saw what happened?]

**IV. Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. _WHILE I WAS THERE I did NOT get ANY MEDICAT TREATMENT FOR MY PROBLEMS NO SEE A DENTIST OR DOCTOR_

**V. Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation.

$ 500,000.00

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _9_ day of _Jan_ , 20 _20_.

Signature of Plaintiff _Ronald Edwards_

Mailing Address _1659 RAMBLE RD_

_____

Telephone Number _267 981 0709_

Fax Number *(if you have one)* _____

E-mail Address _____

Note: All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

For Prisoners:

I declare under penalty of perjury that on this _____ day of _____, 20_____, I am delivering this complaint to prison authorities to be mailed to the Clerk's Office of the United States District Court for the Eastern District of Pennsylvania.

Signature of Plaintiff: _____

Inmate Number _____

Gerald Edwards

v.

Brain Hessenthaler

Christopher A. Pirolli

Paul K. Lagana

Kevin M. Rousset

U.S.C. 42 sec. 1983

1

*GERALD EDWARDS*

*[signature]*

*267 981 0709*

Now comes Gerald Edwards the plaintiff in the case of cp=09-sa-0000318 2019 and 104.

As i stated in my last brief,the constable Jim McMeeding pick me up,never I.D. me and took me to the magistrate Daniel Baranoski at the municipal court.I ask to see a warrant,and they could not show me a warrants.The magistrate said make a plea or go to jail.So i made a plea and the constable took me to jail.but not be for i gave him $100.00.So the magistrate never follow criminal procedures in 234 code rules chapter 5 in Pa.I have attach some of the rules that were not followed exhibit A-D Also see court records.

When i arrived at the bucks county correction facility.I inform the nurse that i had 2 infection teeth that i had been dizziness for the past few days and that i suffered from emphysema and i was using oxygen and in halters for it.

When i was in my cell i filed the paper work to see a dentist and a doctor,but never sean one.So i'm sending along case law and things pertaining to it.see attach Estelle v.Gamble.And this would go to the U.S.C. 14th and 8th amendment.see attach exhibit E-G

As for rule 8.(a)I have made a short plain statements of facks.my demand for relief is $500,000.00.

rule 8.(b)The defenses is;That if the rules of procedures was followed in Pa.rules of criminal procedures title 234 chapter 5,a ID by constables and magistrate and a examining trial.I would not be filling this suite.Also they have violated;Title 18 U.S.C.

sec.241,242,245,247,248,249.see attach exhibit i-l.There failer in this process and dereliction of duty in office has denied me my fullfree enjoyment of my rights under the constitution of the U.S.

rule 8.(c)affirmative defenses;in the above stated,this is frauds, injury by fellow servants, illegality's ,contributory negligence. rule 8.(e)I made my pleading at the beginning. After i got out of jail i went to St. Marys hospital for treatments.see attach.

As you can see in the court transcript and court records that they had noting or that they prove nothing.They all were biased . In AbA tells us about a attorneys conduct and (judges).see attached Prayer.so it would sean that i have a right to exemplary damages of $500,000.00 in this suite.

# Pennsylvania Code (Last Updated: April 5, 2016) Title 234. RULES OF CRIMINAL PROCEDURE Chapter 5. PRETRIAL PROCEDURES IN COURT CASES

## Section 504. Contents of Complaint

*Latest version.*

Every complaint shall contain:

(1) the name of the affiant;

(2) the name and address of the defendant, or if unknown, a description of the defendant as nearly as may be;

(3) a direct accusation to the best of the affiant's knowledge, or information and belief, that the defendant violated the penal laws of the Commonwealth of Pennsylvania;

(4) the date when the offense is alleged to have been committed; provided, however:

(a) if the specific date is unknown, or if the offense is a continuing one, it shall be sufficient to state that it was committed on or about any date within the period of limitations; and

(b) if the date or day of the week is an essential element of the offense charged, such date or day must be specifically set forth;

(5) the place where the offense is alleged to have been committed;

(6) (a) in a court case, a summary of the facts sufficient to advise the defendant of the nature of the offense charged, but neither the evidence nor the statute allegedly violated need be cited in the complaint. However, a citation of the statute allegedly violated, by itself, shall not be sufficient for compliance with this subsection; or

(b) in a summary case, a citation of the specific section and subsection of the statute or ordinance allegedly violated, together with a summary of the facts sufficient to advise the defendant of the nature of the offense charged;

(7) a statement that the acts of the defendant were against the peace and dignity of the Commonwealth of Pennsylvania or in violation of an ordinance of a political subdivision;

*exhibit* **A**

(8) a notation if criminal <u>laboratory services</u> are requested in the case;

(9) a notation that the defendant has or has not been fingerprinted;

(10) a request for the issuance of a warrant of arrest or a summons, unless an arrest has already been effected;

(11) a verification by the affiant that the facts set forth in the complaint are true and correct to the affiant's personal knowledge, or information and belief, and that any false statements therein are made subject to the penalties of the Crimes Code, 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities; and

(12) the signature of the affiant and the date of the execution of the complaint.

### Comment

This rule sets forth the required contents of all complaints whether the affiant is a law enforcement officer, a police officer, or a private citizen. When the affiant is a private citizen, the complaint must be submitted to an attorney for the Commonwealth for approval. See Rule 506. When the district attorney elects to proceed under Rule 507 (Approval of Police Complaints and Arrest Warrant Affidavits by Attorney for the Commonwealth—Local Option), the police officer must likewise submit the complaint for approval by an attorney for the Commonwealth.

Ordinarily, whenever a misdemeanor, felony, or murder is charged, any summary offense in such a case, if known at the time, should be charged in the same complaint, and the case should proceed as a court case under Chapter 5 Part B. See *Commonwealth v. Caufman*, 541 Pa. 299, 662 A.2d 1050 (1995) and *Commonwealth v. Campana*, 455 Pa. 622, 304 A.2d 432 (1973), vacated and remanded, 414 U.S. 808 (1973), on remand, 454 Pa. 233, 314 A.2d 854 (1974) (compulsory joinder rule). In judicial districts in which there is a <u>traffic court</u> established pursuant to 42 Pa.C.S. §§ 1301—1342, when a summary motor vehicle offense within the jurisdiction of the traffic court arises in the same criminal episode as another summary offense or a misdemeanor, felony, or murder offense, see 42 Pa.C.S. § 1302 and *Commonwealth v. Masterson*, 275 Pa. Super. 166, 418 A.2d 664 (1980).

Paragraph (8) requires the affiant who prepares the complaint to indicate on the complaint whether criminal laboratory services are requested in the case. This information is necessary to alert the magisterial district judge, the district attorney, and the court that the defendant in the case may be liable for a criminal laboratory user fee. See 42 Pa.C.S. § 1725.3 that requires a defendant to be sentenced to pay a criminal laboratory user fee in certain specified cases when laboratory services are required to prosecute the case.

The requirement that the affiant who prepares the complaint indicate whether the defendant has been fingerprinted as required by the Criminal History Record Information Act, 18 Pa.C.S. § 9112, is included so that the issuing authority knows whether it is necessary to issue a



fingerprint order with the summons as required by Rule 510.

Official Note

Original Rule 104 adopted June 30, 1964, effective January 1, 1965; suspended January 31, 1970, effective May 1, 1970. New Rule 104 adopted January 31, 1970, effective May 1, 1970; renumbered Rule 132 September 18, 1973, effective January 1, 1974; amended October 22, 1981, effective January 1, 1982; amended November 9, 1984, effective January 2, 1985; amended July 25, 1994, effective January 1, 1995; renumbered Rule 104 and Comment revised August 9, 1994, effective January 1, 1995; renumbered Rule 504 and Comment revised March 1, 2000, effective April 1, 2001; Comment revised March 9, 2006, effective September 1, 2006; amended July 10, 2008, effective February 1, 2009.

*Committee Explanatory Reports*:

Report explaining the July 25, 1994 amendment published with Court's Order at 24 Pa.B. 4068 (August 13, 1994).

Report explaining the August 9, 1994 Comment revisions published at 22 Pa.B. 6 (January 4, 1992); Final Report published with the Court's Order at 24 Pa.B. 4342 (August 27, 1994).

Final Report explaining the March 1, 2000 reorganization and renumbering of the rules published with the Court's Order at 30 Pa.B. 1478 (March 18, 2000).

Final Report explaining the March 3, 2006 Comment revision published with the Court's Order at 36 Pa.B. 1392 (March 25, 2006).

Final Report explaining the July 10, 2008 amendments adding new paragraph (9) requiring a notation concerning fingerprinting published with the Court's Order at 38 Pa.B. 3975 (July 26, 2008).

The provisions of this Rule 504 amended March 9, 2006, effective September 1, 2006, 36 Pa.B. 1385; amended July 10, 2008, effective February 1, 2009, 38 Pa.B. 3971. Immediately preceding text appears at serial pages (318627) to (318628).

About Us  |  Contact Us
Copyright © 2019 by eLaws. All rights reserved.





## Rule 513. Requirements for Issuance; Dissemination of Arrest Warrant Information.

(A)  For purposes of this rule, "arrest warrant information" is defined as the criminal complaint in cases in which an arrest warrant is issued, the arrest warrant, any affidavit(s) of probable cause, and documents or information related to the case.

(B)  ISSUANCE OF ARREST WARRANT

(1)  In the discretion of the issuing authority, advanced communication technology may be used to submit a complaint and affidavit(s) for an arrest warrant and to issue an arrest warrant.

(2)  No arrest warrant shall issue but upon probable cause supported by one or more affidavits sworn to before the issuing authority in person or using advanced communication technology. The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.

(3)  Immediately prior to submitting a complaint and affidavit to an issuing authority using advanced communication technology, the affiant must personally communicate with the issuing authority in person, by telephone, or by any device which allows for simultaneous audio-visual communication. During the communication, the issuing authority shall verify the identity of the affiant, and orally administer an oath to the affiant. In any telephonic communication, if the issuing authority has a concern regarding the identity of the affiant, the issuing authority may require the affiant to communicate by a device allowing for two-way simultaneous audio-visual communication or may require the affiant to appear in person.

(4)  At any hearing on a motion challenging an arrest warrant, no evidence shall be admissible to establish probable cause for the arrest warrant other than the affidavits provided for in paragraph (B)(2).

(C)  DELAY IN DISSEMINATION OF ARREST WARRANT INFORMATION

The affiant or the attorney for the Commonwealth may request that the availability of the arrest warrant information for inspection and dissemination be delayed. The arrest warrant affidavit shall include the facts and circumstances that are alleged to establish good cause for delay in inspection and dissemination.

(1)  Upon a finding of good cause, the issuing authority shall grant the request and order that the availability of the arrest warrant information for inspection and dissemination be delayed for a period of 72 hours or until receipt of notice by the issuing authority that the warrant has been executed, whichever occurs first. The 72-hour period of delay may be preceded by an initial delay period of not more than 24 hours, when additional time is required to complete the administrative processing of the arrest warrant information before the arrest warrant is issued. The issuing authority shall complete the administrative processing of the arrest warrant information prior to the expiration of the initial 24-hour period.

(2)  Upon the issuance of the warrant, the 72-hour period of delay provided in paragraph (C)(1) begins.



(3) In those counties in which the attorney for the Commonwealth requires that complaints and arrest warrant affidavits be approved prior to filing as provided in Rule 507, only the attorney for the Commonwealth may request a delay in the inspection and dissemination of the arrest warrant information.

**Comment**

This rule was amended in 2013 to add provisions concerning the delay in inspection and dissemination of arrest warrant information. Paragraph (A) provides a definition of the term "arrest warrant information" that is used throughout the rule. Paragraph (B) retains the existing requirements for the issuance of arrest warrants. Paragraph (C) establishes the procedures for a temporary delay in the inspection and dissemination of arrest warrant information prior to the execution of the warrant.

ISSUANCE OF ARREST WARRANTS

Paragraph (B)(1) recognizes that an issuing authority either may issue an arrest warrant using advanced communication technology or order that the law enforcement officer appear in person to apply for an arrest warrant.

This rule does not preclude oral testimony before the issuing authority, but it requires that such testimony be reduced to an affidavit prior to issuance of a warrant. All affidavits in support of an application for an arrest warrant must be sworn to before the issuing authority prior to the issuance of the warrant. The language "sworn to before the issuing authority" contemplates, when advanced communication technology is used, that the affiant would not be in the physical presence of the issuing authority. *See* paragraph (B)(3).

All affidavits and applications filed pursuant to this rule are public records. However, in addition to restrictions placed by law and rule on the disclosure of confidential information, the filings required by this rule are subject to the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* and may require further precautions, such as placing certain types of information in a "Confidential Information Form" or providing both a redacted and unredacted version of the filing. *See* Rule 113.1.

This rule carries over to the arrest warrant the requirement that the evidence presented to the issuing authority be reduced to writing and sworn to, and that only the writing is subsequently admissible to establish that there was probable cause. In these respects, the procedure is similar to that applicable to search warrants. *See* Rule 203. For a discussion of the requirement of probable cause for the issuance of an arrest warrant, see *Commonwealth v. Flowers*, 369 A.2d 362 (Pa. Super. 1976).

The affidavit requirements of this rule are not intended to apply when an arrest warrant is to be issued for noncompliance with a citation, with a summons, or with a court order.

An affiant seeking the issuance of an arrest warrant, when permitted by the issuing authority, may use advanced communication technology as defined in Rule 103.

When advanced communication technology is used, the issuing authority is required by this rule to (1) determine that the evidence contained in the affidavit(s) establishes probable cause, and (2) verify the identity of the affiant.

Verification methods include, but are not limited to, a "call back" system, in which the issuing authority would call the law enforcement agency or police department that the affiant indicates is the entity seeking the warrant; a "signature comparison" system whereby the issuing authority would



234 Pa. Code Rule 590. Pleas and Plea Agreements.

https://www.pacode.com/secure/data/234/chapter5/s590.html

The Pennsylvania
CODE

PREVIOUS · NEXT · CHAPTER · TITLE · BROWSE · SEARCH · HOME
TOC      TOC

# PART H. Plea Procedures

## Rule 590. Pleas and Plea Agreements.

(A) GENERALLY.

(1) Pleas shall be taken in open court.

(2) A defendant may plead not guilty, guilty, or, with the consent of the judge, nolo contendere. If the defendant refuses to plead, the judge shall enter a plea of not guilty on the defendant's behalf.

(3) The judge may refuse to accept a plea of guilty or nolo contendere, and shall not accept it unless the judge determines after inquiry of the defendant that the plea is voluntarily and understandingly tendered. Such inquiry shall appear on the record.

(B) PLEA AGREEMENTS.

(1) At any time prior to the verdict, when counsel for both sides have arrived at a plea agreement, they shall state on the record in open court, in the presence of the defendant, the terms of the agreement, unless the judge orders, for good cause shown and with the consent of the defendant, counsel for the defendant, and the attorney for the Commonwealth, that specific conditions in the agreement be placed on the record in camera and the record sealed.

(2) The judge shall conduct a separate inquiry of the defendant on the record to determine whether the defendant understands and voluntarily accepts the terms of the plea agreement on which the guilty plea or plea of nolo contendere is based.

(3) Any local rule that is inconsistent with the provisions of this rule is prohibited, including any local rule mandating deadline dates for the acceptance of a plea entered pursuant to a plea agreement.

(C) MURDER CASES.

In cases in which the imposition of a sentence of death is not authorized, when a defendant enters a plea of guilty or nolo contendere to a charge of murder generally, the degree of guilt shall be determined by a jury unless the attorney for the Commonwealth elects to have the judge, before whom the plea was entered, alone determine the degree of



guilt.

## Comment

The purpose of paragraph (A)(2) is to codify the requirement that the judge, on the record, ascertain from the defendant that the guilty plea or plea of nolo contendere is voluntarily and understandingly tendered. On the mandatory nature of this practice, see *Commonwealth v. Ingram*, 316 A.2d 77 (Pa. 1974); *Commonwealth v. Campbell*, 304 A.2d 121 (Pa. 1973); *Commonwealth v. Jackson*, 299 A.2d 209 (Pa. 1973).

It is difficult to formulate a comprehensive list of questions a judge must ask of a defendant in determining whether the judge should accept the plea of guilty or a plea of nolo contendere. Court decisions may add areas to be encompassed in determining whether the defendant understands the full impact and consequences of the plea, but is nevertheless willing to enter that plea. At a minimum the judge should ask questions to elicit the following information:

(1) Does the defendant understand the nature of the charges to which he or she is pleading guilty or nolo contendere?

(2) Is there a factual basis for the plea?

(3) Does the defendant understand that he or she has the right to trial by jury?

(4) Does the defendant understand that he or she is presumed innocent until found guilty?

(5) Is the defendant aware of the permissible range of sentences and/or fines for the offenses charged?

(6) Is the defendant aware that the judge is not bound by the terms of any plea agreement tendered unless the judge accepts such agreement?

(7) Does the defendant understand that the Commonwealth has a right to have a jury decide the degree of guilt if the defendant pleads guilty to murder generally?

The Court in *Commonwealth v. Willis*, 369 A.2d 1189 (Pa. 1977), and *Commonwealth v. Dilbeck*, 353 A.2d 824 (Pa. 1976), mandated that, during a guilty plea colloquy, judges must elicit the information set forth in paragraphs (1) through (6) above. In 2008, the Court added paragraph (7) to the list of areas of inquiry.

Many, though not all, of the areas to be covered by such questions are set forth in a footnote to the Court's opinion in *Commonwealth v. Martin*, 282 A.2d 241, 244-245 (Pa. 1971), in which the colloquy conducted by the trial judge is cited with approval. *See also Commonwealth v. Minor*, 356 A.2d 346 (Pa. 1976), and *Commonwealth v. Ingram*, 316 A.2d 77 (Pa. 1974). As to the requirement that the judge ascertain that there is a factual basis for the plea, see *Commonwealth v. Maddox*, 300 A.2d 503 (Pa. 1973) and *Commonwealth v. Jackson*, 299 A.2d 209 (Pa. 1973).



*Committee Explanatory Reports:*

Final Report explaining the March 1, 2000 reorganization and renumbering of the rules published with the Court's Order at 30 Pa.B. 1478 (March 18, 2000).

Final Report explaining the December 19, 2007 changes to paragraph (A) concerning areas of inquiry for waiver colloquy published with the Court's Order at 38 Pa.B. 62 (January 5, 2008).

Final Report explaining the March 29, 2011 changes to the Comment adding citations to recent case law concerning right to counsel, time for withdrawal of waiver, and forfeiture of right to counsel published with the Court's Order at 41 Pa.B. 2000 (April 16, 2011).

**Source**

The provisions of this Rule 121 amended December 19, 2007, effective February 1, 2008, 38 Pa.B. 61; amended March 29, 2011, effective May 1, 2011, 41 Pa.B. 1999. Immediately preceding text appears at serial pages (332091) to (332092) and (348259).

## Rule 122. Appointment of Counsel.

(A)  Counsel shall be appointed:

(1)  in all summary cases, for all defendants who are without financial resources or who are otherwise unable to employ counsel when there is a likelihood that imprisonment will be imposed;

(2)  in all court cases, prior to the preliminary hearing to all defendants who are without financial resources or who are otherwise unable to employ counsel;

(3)  in all cases, by the court, on its own motion, when the interests of justice require it.

(B)  When counsel is appointed,

(1)  the judge shall enter an order indicating the name, address, and phone number of the appointed counsel, and the order shall be served on the defendant, the appointed counsel, the previous attorney of record, if any, and the attorney for the Commonwealth pursuant to Rule 114 (Orders and Court Notices: Filing; Service; and Docket Entries); and

(2)  the appointment shall be effective until final judgment, including any proceedings upon direct appeal.

(C)  A motion for change of counsel by a defendant for whom counsel has been appointed shall not be granted except for substantial reasons.

**Comment**

This rule is designed to implement the decisions of *Argersinger v. Hamlin*, 407 U. S. 25 (1972), and *Coleman v. Alabama*, 399 U. S. 1 (1970), that no defendant in a summary case be sentenced to

Supreme Court
- about
- search
- liibulletin
- subscribe
- previews

# Estelle v. Gamble

**429 U.S. 97**

**Estelle v. Gamble (No. 75-929)**

**Argued: October 5, 1976**

**Decided: November 30, 1976**

----

- Syllabus
- **Opinion**, Marshall
- **Dissent**, Stevens

## Syllabus

Respondent state inmate brought this civil rights action under 42 U.S.C. § 1983 against petitioners, the state corrections department medical director (Gray) and two correctional officials, claiming that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment for inadequate treatment of a back injury assertedly sustained while he was engaged in prison work. The District Court dismissed the complaint for failure to state a claim upon which relief could be granted. The Court of Appeals held that the alleged insufficiency of the medical treatment required reinstatement of the complaint.

*Held:* Deliberate indifference by prison personnel to a prisoner's serious illness or injury constitutes cruel and unusual punishment contravening the Eighth Amendment. Here, however, respondent's claims against Gray do not suggest such indifference, the allegations revealing that Gray and other medical personnel saw respondent on 17 occasions during a 3-month span and treated his injury and other problems. The failure to perform an X-ray or to use additional diagnostic techniques does not constitute cruel and unusual punishment, but is, at most, medical malpractice

E

1 to 16 is E

cognizable in the state courts. The question whether respondent has stated a constitutional claim against the other petitioners, the Director of the Department of Corrections and the warden of the prison, was not separately evaluated by the Court of Appeals, and should be considered on remand. Pp. 101-108.

516 F.2d 937, reversed and remanded.

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C.J., and BRENNAN, STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., concurred in the judgment. STEVENS, J., filed a dissenting opinion, *post,* p. 108. **[p98]**

TOP
**Opinion**

MARSHALL, J., Opinion of the Court

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Respondent J. W. Gamble, an inmate of the Texas Department of Corrections, was injured on November 9, 1973, while performing a prison work assignment. On February 11, 1974, he instituted this civil rights action under 42 U.S.C. § 1983 [n1] complaining of the treatment he received after the injury. Named as defendants were the petitioners, W. J. Estelle, Jr., Director of the Department of Corrections, H. H. Husbands, warden of the prison, and Dr. Ralph Gray, medical director of the Department and chief medical officer of the prison hospital. The District Court, *sua sponte,* dismissed the complaint for failure to state a claim upon which relief could be granted. [n2] The Court of Appeals reversed and remanded with instructions to reinstate the complaint. 516 F.2d 937 (CA5 1975). We granted certiorari, 424 U.S. 907 (1976). **[p99]**

I

Because the complaint was dismissed for failure to state a claim, we must take as true its handwritten *pro se* allegations. *Cooper v. Pate,* 378 U.S. 546 (1964). According to the complaint, Gamble was injured on November 9, 1973, when a bale of cotton [n3] fell on him while he was unloading a truck. He continued to work, but ,after four hours, he became stiff and was granted a pass to the unit hospital. At the hospital, a medical assistant, "Captain" Blunt, checked him for a hernia and sent him back to his cell. Within two hours, the pain became so intense that Gamble returned to the hospital, where he was given pain pills by an inmate nurse and then was examined by a doctor. The following day, Gamble saw a Dr. Astone, who diagnosed the injury as a lower

back strain, prescribed Zactirin (a pain reliever) and Robaxin (a muscle relaxant), [n4] and placed respondent on "cell pass, cell feed" status for two days, allowing him to remain in his cell at all times except for showers. On November 12, Gamble again saw Dr. Astone, who continued the medication and cell pass, cell feed for another seven days. He also ordered that respondent be moved from an upper to a lower bunk for one week, but the prison authorities did not comply with that directive. The following week, Gamble returned to Dr. Astone. The doctor continued the muscle relaxant but prescribed a new pain reliever, Febridyne, and placed respondent on cell-pass for seven days, permitting him to remain in his cell except for meals and showers. On November 26, respondent again saw Dr. Astone, who put respondent back on the original pain reliever for five days and continued the cell-pass for another week. **[p100]**

On December 3, despite Gamble's statement that his back hurt as much as it had the first day, Dr. Astone took him off cell-pass, thereby certifying him to be capable of light work. At the same time, Dr. Astone prescribed Febridyne for seven days. Gamble then went to a Major Muddox and told him that he was in too much pain to work. Muddox had respondent moved to "administrative segregation." [n5] On December 5, Gamble was taken before the prison disciplinary committee, apparently because of his refusal to work. When the committee heard his complaint of back pain and high blood pressure, it directed that he be seen by another doctor.

On December 6, respondent saw petitioner Gray, who performed a urinalysis, blood test, and blood pressure measurement. Dr. Gray prescribed the drug Ser-Ap-Es for the high blood pressure and more Febridyne for the back pain. The following week respondent again saw Dr. Gray, who continued the Ser-Ap-Es for an additional 30 days. The prescription was not filled for four days, however, because the staff lost it. Respondent went to the unit hospital twice more in December; both times he was seen by Captain Blunt, who prescribed Tiognolos (described as a muscle relaxant). For all of December, respondent remained in administrative segregation.

In early January, Gamble was told on two occasions that he would be sent to the "farm" if he did not return to work. He refused, nonetheless, claiming to be in too much pain. On January 7, 1974, he requested to go on sick call for his back pain and migraine headaches. After an initial refusal, he saw Captain Blunt, who prescribed sodium salicylate (a **[p101]** pain reliever) for several days and Ser-Ap-Es for 30 days. Respondent returned to Captain Blunt on January 17 and January 25, and received renewals of the pain reliever prescription both times. Throughout the month, respondent was kept in administrative segregation.

On January 31, Gamble was brought before the prison disciplinary committee for his

refusal to work in early January. He told the committee that he could not work because of his severe back pain and his high blood pressure. Captain Blunt testified that Gamble was in "first class" medical condition. The committee, with no further medical examination or testimony, placed respondent in solitary confinement.

Four days later, on February 4, at 8 am., respondent asked to see a doctor for chest pains and "blank outs." It was not until 7:30 that night that a medical assistant examined him and ordered him hospitalized. The following day, a Dr. Heaton performed an electrocardiogram; one day later, respondent was placed on Quinidine for treatment of irregular cardiac rhythm and moved to administrative segregation. On February 7, respondent again experienced pain in his chest, left arm, and back and asked to see a doctor. The guards refused. He asked again the next day. The guards again refused. Finally, on February 9, he was allowed to see Dr. Heaton, who ordered the Quinidine continued for three more days. On February 11, he swore out his complaint.

II

The gravamen of respondent's § 1983 complaint is that petitioners have subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth. [n6]See Robinson v. California,[p102] 370 U.S. 660 (1962). We therefore base our evaluation of respondent's complaint on those Amendments and our decisions interpreting them.

The history of the constitutional prohibition of "cruel and unusual punishments" has been recounted at length in prior opinions of the Court, and need not be repeated here. See, e.g., Gregg v. Georgia, 428 U.S. 153, 169-173 (1976) (joint opinion of STEWART, POWELL, and STEVENS, JJ. (hereinafter joint opinion)); see also Granucci, Nor Cruel and Unusual Punishment Inflicted: The Original Meaning, 57 Calif.L.Rev. 839 (1969). It suffices to note that the primary concern of the drafters was to proscribe "torture[s]" and other "barbar[ous]" methods of punishment. Id. at 842. Accordingly, this Court first applied the Eighth Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment. See Wilkerson v. Utah, 99 U.S. 130, 136 (1879) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment . . ."); In re Kemmler, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death. . . .").

Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. See, e.g., Gregg v. Georgia, supra at 171 (joint opinion); Trop v. Dulles, 356 U.S. 86, 100-101 (1958); Weems v. United States,

217 U.S. 349, 373 (1910). The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ," *Jackson v. Bishop,* 404 F.2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles, supra* at 101; *see also Gregg v. Georgia, supra* at 172-173 (joint opinion); *Weems v. United States, supra* at 378, **[p103]** or which "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra* at 173 (joint opinion); *see also Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463 (1947); *Wilkerson v. Utah, supra* at 136. **[n7]**

These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," *In re Kemmler, supra,* the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. *Cf. Gregg v. Georgia, supra,* at 182-183 (joint opinion). The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation **[n8]**codifying the common **[p104]** law view that "it is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself." **[n9]**

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra,* at 173 (joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs **[n10]** or by prison guards in intentionally denying or delaying access to medical **[p105]** care **[n11]** or intentionally interfering with the treatment once prescribed. **[n12]** Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain. In *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459"] 329 U.S. 459 (1947), for example, the Court concluded that it was not unconstitutional to force a prisoner to undergo a second effort to electrocute him after a mechanical malfunction had thwarted the first attempt. Writing for the

plurality, Mr. Justice Reed reasoned that the second execution would not violate the Eighth Amendment because the first attempt was an "unforeseeable accident." *Id.* at 464. Mr. Justice Frankfurter's concurrence, based solely on the Due Process Clause of the Fourteenth Amendment, concluded that, since the first attempt had failed because of "an innocent misadventure," *id.* at 470, the second would not be "'repugnant to the conscience of mankind,'" *id.* at 471, quoting 329 U.S. 459 (1947), for example, the Court concluded that it was not unconstitutional to force a prisoner to undergo a second effort to electrocute him after a mechanical malfunction had thwarted the first attempt. Writing for the plurality, Mr. Justice Reed reasoned that the second execution would not violate the Eighth Amendment because the first attempt was an "unforeseeable accident." *Id.* at 464. Mr. Justice Frankfurter's concurrence, based solely on the Due Process Clause of the Fourteenth Amendment, concluded that, since the first attempt had failed because of "an innocent misadventure," *id.* at 470, the second would not be "'repugnant to the conscience of mankind,'" *id.* at 471, quoting *Palko v. Connecticut,* 302 U.S. 319, 323 (1937). [n13]

Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be **[p106]** "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. [n14]

III

Against this backdrop, we now consider whether respondent's complaint states a cognizable § 1983 claim. The handwritten *pro se* document is be liberally construed. As the Court unanimously held in *Haines v. Kerner,* 404 U.S. 519 (1972), a *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 520-521, quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). **[p107]**

Even applying these liberal standards, however, Gamble's claims against Dr. Gray, both in his capacity as treating physician and as medical director of the Corrections Department, are not cognizable under § 1983. Gamble was seen by medical

personnel on 17 occasions spanning a three-month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton three times; by an unidentified doctor and inmate nurse on the day of the injury; and by medical assistant Blunt six times. They treated his back injury, high blood pressure, and heart problems. Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the lack of diagnosis and inadequate treatment of his back injury." Response to Pet. for Cert. 4; *see also* Brief for Respondent 19. The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants, and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. *Id.* at 17, 19. The Court of Appeals agreed, stating:

Certainly an X-ray of [Gamble's] lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing.

516 F.2d at 941. But the question whether an X-ray -- or additional diagnostic techniques or forms of treatment -- is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most, it is medical malpractice, and, as such, the proper forum is the state court under the Texas Tort Claims Act. [n15] The Court of Appeals was in error in holding that the alleged insufficiency of the **[p108]** medical treatment required reversal and remand. That portion of the judgment of the District Court should have been affirmed. [n16]

The Court of Appeals focused primarily on the alleged actions of the doctors, and did not separately consider whether the allegations against the Director of the Department of Corrections, Estelle, and the warden of the prison, Husbands, stated a cause of action. Although we reverse the judgment as to the medical director, we remand the case to the Court of Appeals to allow it an opportunity to consider, in conformity with this opinion, whether a cause of action has been stated against the other prison officials.

*It is so ordered.*

MR. JUSTICE BLACKMUN concurs in the judgment of the Court.

1. Title 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. It appears that the petitioner-defendants were not even aware of the suit until it reached the Court of Appeals. Tr. of Oral Arg. 7, 13-15. This probably resulted because the District Court dismissed the complaint simultaneously with granting leave to file it *in forma pauperis.*

3. His complaint states that the bale weighed "6.00 pound." The Court of Appeals interpreted this to mean 600 pounds. 516 F.2d 937, 938 (CA5 1975).

4. The names and descriptions of the drugs administered to respondent are taken from his complaint. App. A-5 - A-1l, and his brief, at 19-20.

5. There are a number of terms in the complaint whose meaning is unclear and, with no answer from the State, must remain so. For example, "administrative segregation" is never defined. The Court of Appeals deemed it the equivalent of solitary confinement. 516 F.2d at 939. We note, however, that Gamble stated he was in "administrative segregation" when he was in the "32A-7 five building" and "32A20 five building," but when he was in "solitary confinement," he was in "3102 five building."

6. The Eighth Amendment provides:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

At oral argument, counsel for respondent agreed that his only claim was based on the Eighth Amendment. Tr. of Oral Arg. 42-43.

7. The Amendment also proscribes punishments grossly disproportionate to the severity of the crime, *Gregg v. Georgia,* 428 U.S. 153, 173 (1976) (joint opinion); *Weems v. United States,* 217 U.S. 349, 367 (1910), and it imposes substantive limits on what can be made criminal and punished, *Robinson v. California,* 370 U.S. 660 (1962). Neither of these principles is involved here.

8. *See, e.g.,* Ala.Code Tit. 45, § 125 (1958); Alaska Stat. § 33.30.050 (1975); Ariz.Rev.Stat.Ann. § 31-201.01 (Supp. 1975); Conn.Gen.Stat.Ann. § 18-7 (1975); Ga.Code Ann. § 77-309(e) (1973); Idaho Code § 20-209 (Supp. 1976); Ill.Ann.Stat. c. 38, § 103-2 (1970); Ind. Ann.Stat. § 11-1-1.1-30.5 (1973); Kan.Stat.Ann. § 75-5429 (Supp. 1975); Md.Ann.Code Art. 27 § 698 (1976); Mass.Ann.Laws, c. 127, § 90A (1974); Mich.Stat.Ann. § 14.84 (1969); Miss.Code Ann. § 47-1-57 (1972); Mo.Ann.Stat. § 221.120 (1962); Neb.Rev.Stat. § 83-181 (1971); N.H.Rev.Stat.Ann. § 619.9 (1974); N.M.Stat.Ann. § 42-2-4 (1972); Tenn.Code Ann. §§ 41-318, 41-1115, 41-1226 (1975); Utah Code Ann. §§ 64-9-13, 64-9-19, 64-9-20, 64-9-53 (1968); Va.Code Ann. §§ 32-81, 32-82 (1973); W.Va.Code Ann. § 25-1-16 (Supp. 1976); Wyo.Stat.Ann. § 18-299 (1959).

Many States have also adopted regulations which specify, in varying degrees of detail, the standards of medical care to be provided to prisoners. *See* Comment, The Rights of Prisoners to Medical Care and the Implications for Drug-Dependent Prisoners and Pretrial Detainees, 42 U.Chi.L.Rev. 705, 708-709 (1975).

Model correctional legislation and proposed minimum standards are all in accord. *See* American Law Institute, Model Penal Code §§ 303.4, 304.5 (1962); National Advisory

Commission on Criminal Justice Standards and Goals, Standards on Rights of Offenders, Standard 2.6 (1973); National Council on Crime and Delinquency, Model Act for the Protection of Rights of Prisoners, § 1(b) (1972); National Sheriffs' Association, Standards for Inmates' Legal Rights, Right No. 3 (1974); Fourth United Nations Congress on Prevention of Crime and Treatment of Offenders, Standard Minimum Rules for the Treatment of Prisoners, Rules 22-26 (1955). The foregoing may all be found in U.S. Dept. of Justice, Law Enforcement Assistance Administration, Compendium of Model Correctional Legislation and Standards (2d ed. 1975).

9. *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291, 293 (1926).

10. *See, e.g., Williams v. Vincent,* 508 F.2d 541 (CA2 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference . . . , rather than an exercise of professional judgment"); *Thomas v. Pate,* 493 F.2d 151, 158 (CA7), *cert. denied sub nom. Thomas v. Cannon,* 419 U.S. 879 (1974) (injection of penicillin with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction); *Jones v. Lockhart,* 484 F.2d 1192 (CA8 1973) (refusal of paramedic to provide treatment); *Martinez v. Mancusi,* 443 F.2d 921 (CA2 1970), *cert. denied,* 401 U.S. 983 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgery unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon).

11. *See, e.g., Westlake v. Lucas,* 537 F.2d 857 (CA6 1976); *Thomas v. Pate, supra* at 158-159; *Fitzke v. Shappell,* 468 F.2d 1072 (CA6 1972); *Hutchens v. Alabama,* 466 F.2d 507 (CA5 1972); *Riley v. Rhay,* 407 F.2d 496 (CA9 1969); *Edwards v. Duncan,* 355 F.2d 993 (CA4 1966); *Hughes v. Noble,* 295 F.2d 495 (CA5 1961).

12. *See, e.g., Wilbron v. Hutto,* 509 F.2d 621, 622 (CA8 1975); *Campbell v. Beto,* 460 F.2d 765 (CA5 1972); *Martinez v. Mancusi, supra; Tolbert v. Eyman,* 434 F.2d 625 (CA9 1970); *Edwards v. Duncan, supra.*

13. He noted, however, that "a series of abortive attempts" or "a single, cruelly willful attempt" would present a different case. 329 U.S. at 471.

14. The Courts of Appeals are in essential agreement with this standard. All agree that mere allegations of malpractice do not state a claim, and, while their terminology regarding what is sufficient varies, their results are not inconsistent with the standard of deliberate indifference. *See Page v. Sharpe,* 487 F.2d 567, 569 (CA1 1973); *Williams v. Vincent, supra* at 544 (uses the phrase "deliberate indifference"); *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (CA3 1970); *Russell v. Sheffer,* 528 F.2d 318 (CA4 1975); *Newman v. Alabama,* 503 F.2d 1320, 1330 n. 14 (CA5 1974), *cert. denied,* 421 U.S. 948 (1975) ("callous indifference"); *Westlake v. Lucas, supra* at 860 ("deliberate indifference"); *Thomas v. Pate, supra* at 158; *Wilbron v. Hutto, supra* at 622 ("deliberate indifference"); *Tolbert v. Eyman, supra* at 626; *Dewell v.Lawson,* 489 F.2d 877, 881-882 (CA10 1974).

15. Tex.Rev.Civ.Stat., Art. 6252-19, § 3 (Supp. 1976). Petitioners assured the Court at argument that this statute can be used by prisoners to assert malpractice claims. Tr. of Oral Arg. 6.

16. Contrary to MR. JUSTICE STEVENS' assertion in dissent, this case signals no retreat from *Haines v. Kerner,* 404 U.S. 519 (1972). In contrast to the general allegations in *Haines,* Gamble's complaint provides a detailed factual accounting of the treatment he received. By his exhaustive description, he renders speculation unnecessary. It is apparent from his complaint that he received extensive medical care and that the doctors were not indifferent to his needs.

**TOP**

## Dissent

STEVENS, J., Dissenting Opinion

MR. JUSTICE STEVENS, dissenting.

Most of what is said in the Court's opinion is entirely consistent with the way the lower federal courts have been processing claims that the medical treatment of prison inmates is so inadequate as to constitute the cruel and unusual punishment prohibited by the Eighth Amendment. I have no serious disagreement with the way this area of the law has developed thus far, or with the probable impact of this opinion. Nevertheless, there are three reasons why I am unable to join it. First, insofar as the opinion orders the dismissal of the complaint against the chief medical **[p109]** officer of the prison, it is not faithful to the rule normally applied in construing the allegations in a pleading prepared by an uncounseled inmate. Second, it does not adequately explain why the Court granted certiorari in this case. Third, it describes the State's duty to provide adequate medical care to prisoners in ambiguous terms which incorrectly relate to the subjective motivation of persons accused of violating the Eighth Amendment, rather than to the standard of care required by the Constitution.

I

The complaint represents a crude attempt to challenge the system of administering medical care in the prison where Gamble is confined. Fairly construed, the complaint alleges that he received a serious disabling back injury in November, 1973, that the responsible prison authorities were indifferent to his medical needs, and that, as a result of that indifference, he has been mistreated and his condition has worsened.

The indifference is allegedly manifested not merely by the failure or refusal to diagnose and treat his injury properly, but also by the conduct of the prison staff. Gamble was placed in solitary confinement for prolonged periods as punishment for refusing to perform assigned work which he was physically unable to perform. [n1] The only medical evidence presented to the disciplinary committee was the statement of a medical assistant that he was in first-class condition, when in fact he was suffering not only from the back sprain but from high blood pressure. Prison guards refused **[p110]** to permit him to sleep in the bunk that a doctor had assigned. On at least one occasion, a medical prescription was not filled for four days because it was lost by staff personnel. When he suffered chest pains and blackouts while in solitary, he was forced to wait 12 hours to see a doctor because clearance had to be obtained from the warden. His complaint also draws into question the character of the attention he received from the doctors and the inmate nurse in response to his 17 attempts to obtain proper diagnosis and treatment for his condition. However, apart from the

medical director who saw him twice, he has not sued any of the individuals who saw him on these occasions. In short, he complains that the system as a whole is inadequate.

On the basis of Gamble's handwritten complaint, it is impossible to assess the quality of the medical attention he received. As the Court points out, even if what he alleges is true, the doctors may be guilty of nothing more than negligence or malpractice. On the other hand, it is surely not inconceivable that an overworked, undermanned medical staff in a crowded prison [n2] is following the expedient course of routinely prescribing nothing more than pain killers when a thorough diagnosis would disclose an obvious need for remedial treatment. [n3] Three fine judges **[p111]** sitting on the United States Court of Appeals for the Fifth Circuit [n4] thought that enough had been alleged to require some inquiry into the actual facts. If this Court meant what it said in *Haines v. Kerner,* 404 U.S. 519, these judges were clearly right. [n5]**[p112]**

The *Haines* test is not whether the facts alleged in the complaint would entitle the plaintiff to relief. Rather, it is whether the Court can say with assurance on the basis of the complaint that, beyond any doubt, *no* set of facts could be proved that would entitle the plaintiff to relief. [n6] The reasons for the *Haines* test are manifest. A *pro se* complaint provides an unsatisfactory foundation for deciding the merits of important questions, because typically it is inartfully drawn, unclear, and equivocal, and because thorough pleadings, affidavits, and possibly an evidentiary hearing will usually bring out facts which simplify or make unnecessary the decision of questions presented by the naked complaint. [n7]**[p113]**

Admittedly, it tempting to eliminate the meritless complaint at the pleading stage. Unfortunately, this "is another instance of judicial haste which, in the long run, makes waste," *Dioguardi v. Durning* 139 F.2d 774, 775 (CA2 1944) (Clark, J.), cited with approval in *Haines v. Kerner, supra* at 521. In the instant case, if the District Court had resisted the temptation of premature dismissal, the case might long since have ended with the filing of medical records or affidavits demonstrating adequate treatment. Likewise, if the decision of the Fifth Circuit reinstating the complaint had been allowed to stand and the case had run its normal course, the litigation probably would have come to an end without the need for review by this Court. Even if the Fifth Circuit had wrongly decided the pleading issue, no great harm would have been done by requiring the State to produce its medical records and move for summary judgment. Instead, the case has been prolonged by two stages of appellate review, and is still not over: the case against two of the defendants may still proceed, and even the **[p114]** claims against the prison doctors have not been disposed of with finality. [n8]

The principal beneficiaries of today's decision will not be federal judges, very little of

whose time will be saved, but rather the "writ-writers" within the prison walls, whose semiprofessional services will be in greater demand. I have no doubt about the ability of such a semiprofessional to embellish this pleading with conclusory allegations which could be made in all good faith and which would foreclose a dismissal without any response from the State. It is unfortunate that today's decision will increase prisoners' dependence on those writ-writers. *See Cruz v. Beto,* 405 U.S. 319, 327 n. 7 (REHNQUIST, J., dissenting).

II

Like the District Court's decision to dismiss the complaint, this Court's decision to hear this case, in violation of its normal practice of denying interlocutory review, *see***[p115]** R. Stern & E. Gressman, Supreme Court Practice 180 (4th ed.1969), ill-serves the interest of judicial economy. Frankly, I was, and still am, puzzled by he Court's decision to grant certiorari. [n9] If the Court merely thought the Fifth Circuit misapplied *Haines v. Kerner* by reading the complaint to liberally, the grant of certiorari is inexplicable. On the other hand, if the Court thought that, instead of a pleading question, the case presented an important constitutional question about the State's duty to provide medical care to prisoners, the crude allegations of this complaint do not provide the kind of factual basis [n10] the Court normally requires as a predicate for the adjudication of a novel and serious constitutional issue, *see, e.g., Rescue Army v. Municipal Court,* 331 U.S. 549, 568-575; *Ellis v. Dixon,* 349 U.S. 458, 464; *Wainwright v. City of New Orleans,* 392 U.S. 598 (Harlan, J., concurring). [n11] Moreover, as the Court notes, all the Courts of Appeals to consider the question have reached substantially the same conclusion that the Court adopts. *Ante* at 106 n. 14. Since the Court seldom takes a case merely to reaffirm settled law, I fail to understand why it has chosen to make this case an exception to its normal practice. **[p116]**

III

By its reference to the accidental character of the first unsuccessful attempt to electrocute the prisoner in *Louisiana ex rel. Francs v. Resweber,* 329 U.S. 459, *see ante* at 105, and by its repeated references to "deliberate indifference" and the "intentional" denial of adequate medical care, I believe the Court improperly attaches significance to the subjective motivation of the defendant as a criterion for determining whether cruel and unusual punishment has been inflicted. [n12] Subjective motivation may well determine what, if any, remedy is appropriate against a particular defendant. However, whether the constitutional standard has been violated should turn on the character of the punishment, rather than the motivation of the individual who inflicted it. [n13] Whether the conditions in Andersonville were the **[p117]** product of design, negligence, or mere poverty, they were cruel and inhuman.

In sum, I remain convinced that the petition for certiorari should have been denied. It having been granted, I would affirm the judgment of the Court of Appeals.

1. In his complaint, Gamble alleged that he had been placed in administrative segregation and remained there through December and January. At the end of January, he was placed in solitary confinement. In an affidavit filed in the Court of Appeals the following December, see n. 8, infra, Gamble alleged that, with the exception of one day in which he was taken out of solitary to be brought before the disciplinary committee, he had remained in solitary up to the date of the affidavit.

2. According to a state legislative report quoted by the Court of Appeals, the Texas Department of Corrections has had at various times one to three doctors to care for 17,000 inmates with occasional part-time help. 516 F.2d 937, 940-941, n. 1 (1975).

3. This poorly drafted complaint attempts to describe conditions which resemble those reported in other prison systems. For instance, a study of the Pennsylvania prison system reported:

When ill, the prisoner's point of contact with a prison's health care program is the sick call line. Access may be barred by a guard, who refuses to give the convict a hospital pass out of whimsy or prejudice, or in light of a history of undiagnosed complaints. At sick call, the convict commonly first sees a civilian paraprofessional or a nurse, who may treat the case with a placebo without actual examination, history-taking or recorded diagnosis. Even seeing the doctor at some prisons produces no more than aspirin for symptoms, such as dizziness and fainting, which have persisted for years.

Health Law Project, University of Pennsylvania, Health Care and Conditions in Pennsylvania's State Prisons, in American Bar Association Commission on Correctional Facilities and Services, Medical and Health Care in Jails, Prisons, and Other Correctional Facilities: A Compilation of Standards and Materials 71, 81-82 (Aug.1974).

A legislative report on California prisons found:

By far, the area with the greatest problem at the hospital [at one major prison], and perhaps at all the hospitals, was that of the abusive doctor-patient relationship. Although the indifference of M. T. A.s [medical technical assistants] toward medical complaints by inmates is not unique at Folsom, and has been reported continuously elsewhere, the calloused and frequently hostile attitude exhibited by the doctors is uniquely reprehensible. . . .

Typical complaints against [one doctor] were that he would . . . not adequately diagnose or treat a patient who was a disciplinary problem at the prison. . . .

Assembly Select Committee on Prison Reform and Rehabilitation, An Examination of California's Prison Hospitals, 661 (1972).

These statements by responsible observers demonstrate that it is far from fanciful to

read a prisoner's complaint as alleging that only *pro forma* treatment was provided.

4. The panel included Mr. Justice Clark, a retired member of this Court, sitting by designation, and Circuit Judges Goldberg and Ainsworth.

5. In *Haines,* a unanimous Supreme Court admonished the federal judiciary to be especially solicitous of the problems of the uneducated inmate seeking to litigate on his own behalf. The Court said:

Whatever may be the limits on the scope of inquiry of courts into the internal administration of prisons, allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We cannot say with assurance that under the allegations of the *pro se* complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). *See Dioguardi v. Durning,* 139 F.2d 774 (CA2 1944).

404 U.S. at 520-521. Under that test, the complaint should not have been dismissed without, at the very minimum, requiring some response from the defendants. It appears from the record that, although the complaint was filed in February, instead of causing it to be served on the defendants, as required by Fed.Rule Civ.Proc. 4, the Clerk of the District Court referred it to a magistrate, who decided in June that the case should be dismissed before any of the normal procedures were even commenced. At least one Circuit has held that dismissal without service on the defendants is improper, *Nichols v. Schubert,* 499 F.2d 946 (CA7 1974). The Court's disposition of this case should not be taken as an endorsement of this practice since the question was not raised by the parties.

6. This is the test actually applied in *Haines,* for, although the Court ordered the complaint reinstated, it expressly "intimate[d] no view whatever on the merits of petitioner's allegations," 404 U.S. at 521. It is significant that the Court took this approach despite being pressed by the State to decide the merits. As in this case, the State argued forcefully that the facts alleged in the complaint did not amount to a constitutional violation. (Only in one footnote in its 51-page brief did the State discuss the pleading question, Brief for Respondents 22-23, n. 20, in No. 70-5025, O.T. 1971.) Yet this Court devoted not a single word of its opinion to answering the argument that no constitutional violation was alleged.

7. Thus, *Haines* teaches that the decision on the merits of the complaint should normally be postponed until the facts have been ascertained. The same approach was taken in *Polk Co. v. Glover,* 305 U.S. 5, in which the Court reversed the dismissal of a complaint, without intimating any view of the constitutional issues, on "[t]he salutary principle that the essential facts should be determined before passing upon grave constitutional questions. . . ." *Id.* at 10. *See also Borden's Co. v. Baldwin,* 293 U.S. 194, 213 (Cardozo and Stone, JJ., concurring in result). This approach potentially avoids the necessity of ever deciding the constitutional issue, since the facts as proved may remove any constitutional question. Alternatively, a more concrete record will be available on which to decide the constitutional issues. *See generally Rescue Army v. Municipal Court,* 331 U.S. 549, 574-575. Even when constitutional principles are not involved, it is important that "the conceptual legal theories be explored and assayed in the light of actual facts, not as a pleader's supposition," so that

courts may avoid "elucidating legal responsibilities as to facts which may never be." *Shull v. Pilot Life Ins. Co.,* 313 F.2d 445, 447 (CA5 1963).

8. In an affidavit filed in the Court of Appeals, Gamble states that he has been transferred to another prison, placed in solitary confinement, and denied any medical care at all. These conditions allegedly were continuing on December 3, 1974, the date of the affidavit. The Court of Appeals apparently considered these allegations, as shown by a reference to

the fact that [Gamble] has spent months in solitary confinement without medical care and stands a good chance of remaining that way without intervention,

516 F.2d at 941. Presumably the Court's remand does not bar Gamble from pursuing these charges, if necessary through filing a new complaint or formal amendment of the present complaint. The original complaint also alleged that prison officials failed to comply with a doctor's order to move Gamble to a lower bunk, that they put him in solitary confinement when he claimed to be physically unable to work, and that they refused to allow him to see a doctor for two days while he was in solitary. Gamble's medical condition is relevant to all these allegations. It is therefore probable that the medical records will be produced and that testimony will be elicited about Gamble's medical care. If the evidence should show that he in fact sustained a serious injury and received only *pro forma* care, he would surely be allowed to amend his pleading to reassert a claim against one or more of the prison doctors.

9.

The only remarkable thing about this case is its presence in this Court. For the case involves no more than the application of well settled principles to a familiar situation, and has little significance except for the respondent. Why certiorari was granted is a mystery to me -- particularly at a time when the Court is thought by many to be burdened by too heavy a caseload.

*Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 189 (STEWART, J., dissenting).

10. As this Court notes, *ante* at 100 n. 5, even the meaning of some of the terms used in the complaint is unclear.

11. If this was the reason for granting certiorari, the writ should have been dismissed as improvidently granted when it became clear at oral argument that the parties agreed on the constitutional standard and disagreed only as to its application to the allegations of this particular complaint. *See* Tr. of Oral Arg. 38, 48.

12. As the four dissenting Justices in *Resweber* pointed out:

The intent of the executioner cannot lessen the torture or excuse the result. It was the statutory duty of the state officials to make sure that there was no failure.

329 U.S. at 477 (Burton, J., joined by Douglas, Murphy, and Rutledge, JJ.).

13. The Court indicates the Eighth Amendment is violated "by prison guards in intentionally denying or

delaying access to medical care or intentionally interfering with the treatment once prescribed." *Ante* at 104-105. If this is meant to indicate that intent is a necessary part of an Eighth Amendment violation, I disagree. If a State elects to impose imprisonment as a punishment for crime, I believe it has an obligation to provide the persons in its custody with a health care system which meets minimal standards of adequacy. As a part of that basic obligation, the State and its agents have an affirmative duty to provide reasonable access to medical care, to provide competent, diligent medical personnel, and to ensure that prescribed care is in fact delivered. For denial of medical care is surely not part of the punishment which civilized nations may impose for crime.

Of course, not every instance of improper health care violates the Eighth Amendment. Like the rest of us, prisoners must take the risk that a competent, diligent physician will make an error. Such an error may give rise to a tort claim, but not necessarily to a constitutional claim. But when the State adds to this risk, as by providing a physician who does not meet minimum standards of competence or diligence or who cannot give adequate care because of an excessive caseload or inadequate facilities, then the prisoner may suffer from a breach of the State's constitutional duty.

Accessibility     About LII     Contact us     Advertise here     Help     Terms of use

Privacy

LII > U.S. Constitution > Eighth Amendment

# Eighth Amendment

Most often mentioned in the context of the death penalty, the Eighth Amendment prohibits cruel and unusual punishments, but also mentions "excessive fines" and bail. The "excessive fines" clause surfaces (among other places) in cases of civil and criminal forfeiture, for example when property is seized during a drug raid.

Learn more ...

## Amendment VIII

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

‹ Seventh Amendment up Ninth Amendment ›

💼 U.S.
Constitution
Toolbox

- **Explanation of**
  **the**
  **Constitution** -





# 14th Amendment

The Fourteenth Amendment addresses many aspects of citizenship and the rights of citizens. The most commonly used -- and frequently litigated -- phrase in the amendment is "equal protection of the laws", which figures prominently in a wide variety of landmark cases, including Brown v. Board of Education (racial discrimination), Roe v. Wade (reproductive rights), Bush v. Gore (election recounts), Reed v. Reed (gender discrimination), and University of California v. Bakke (racial quotas in education). See more...

Amendment XIV

Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 2.

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens



## Section 3.

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

## Section 4.

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

## Section 5.

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

wex resources

Section 1.

Privileges and Immunities Clause

Civil Rights

Slaughterhouse Cases

Due Process

Substantive Due Process

Right of Privacy: Personal Autonomy

Territorial Jurisdiction

Equal Protection

Plessy v. Ferguson (1896)

Plyer v. Doe (1982)





# BUCKS COUNTY DEPARTMENT OF CORRECTIONS
## INCARCERATION DATE

AS OF: 7/29/19    1:02PM

| | | |
|---|---|---|
| **Name:** | EDWARDS, GERALD RUSSELL | |
| **Inmate Address** | 372721 N DARRION<br>Philadelphia, PA 19134 | () - |
| **Inmate Address** | 2076 COUNTY LINE RD.<br>APT 159<br>HUNTINGDON VALLEY, PA 19006 | (267) 226-9709 |
| **Inmate Address** | 1652 PROPECT AVENUE<br>Langhorne, PA 19047 | (267) 981-0709 |

**DOB:** 11/02/1944
**Sex:** MALE
**BCP#:** 109231
**Booking #:** 2019001721

**Admit Date:** 4/3/19  16:34
**Release Date:** 4/8/19  8:34

H

# DEPRIVATION OF RIGHTS UNDER COLOR OF LAW

SUMMARY:

Section 242 of Title 18 makes it a crime for a person acting under color of any law to wi a person of a right or privilege protected by the Constitution or laws of the United States For the purpose of Section 242, acts under "color of law" include acts not only done by or local officials within the their lawful authority, but also acts done beyond the bounds c official's lawful authority, if the acts are done while the official is purporting or pretend the performance of his/her official duties. Persons acting under color of law within the m this statute include police officers, prisons guards and other law enforcement officials, a judges, care providers in public health facilities, and others who are acting as public offi necessary that the crime be motivated by animus toward the race, color, religion, sex, h familial status or national origin of the victim.

The offense is punishable by a range of imprisonment up to a life term, or the death per depending upon the circumstances of the crime, and the resulting injury, if any.

## TITLE 18, U.S.C., SECTION 242

*Whoever, under color of any law, statute, ordinance, regulation, or custom, willfu any person in any State, Territory, Commonwealth, Possession, or District to the of any rights, privileges, or immunities secured or protected by the Constitution c the United States, ... shall be fined under this title or imprisoned not more than or both; and if bodily injury results from the acts committed in violation of this secti acts include the use, attempted use, or threatened use of a dangerous weapon, e. fire, shall be fined under this title or imprisoned not more than ten years, or both; results from the acts committed in violation of this section or if such acts include or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggra abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any t( or for life, or both, or may be sentenced to death.*

Return to the Criminal Sectio

*Updated .*

---

Was this page helpful?

Yes     No

# CONSPIRACY AGAINST RIGHTS

SUMMARY:

Section 241 of Title 18 is the civil rights conspiracy statute. Section 241 makes it unlawf
more persons to agree together to injure, threaten, or intimidate a person in any state, t
district in the free exercise or enjoyment of any right or privilege secured to him/her by t
Constitution or the laws of the Unites States, (or because of his/her having exercised th
Unlike most conspiracy statutes, Section 241 does not require that one of the conspirat
an overt act prior to the conspiracy becoming a crime.

The offense is punishable by a range of imprisonment up to a life term or the death pen
depending upon the circumstances of the crime, and the resulting injury, if any.

### TITLE 18, U.S.C., SECTION 241

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in
Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of ar
privilege secured to him by the Constitution or laws of the United States, or because of
exercised the same;...

They shall be fined under this title or imprisoned not more than ten years, or both; and i
results from the acts committed in violation of this section or if such acts include kidnap
attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexua
attempt to kill, they shall be fined under this title or imprisoned for any term of years or f
both, or may be sentenced to death.

Return to the Criminal Sectio

*Updated*

Was this page helpful?

Yes     No



LII > U.S. Code > Title 18. CRIMES AND CRIMINAL PROCEDURE
> Part I. CRIMES > Chapter 13. CIVIL RIGHTS
> **Section 249. Hate crime acts**

# 18 U.S. Code § 249. Hate crime acts

U.S. Code     Notes

**(a) IN GENERAL.—**

**(1) OFFENSES INVOLVING ACTUAL OR PERCEIVED RACE, COLOR, RELIGION, OR NATIONAL ORIGIN.—**Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person—

**(A)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and

**(B)** shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if—

**(i)** death results from the offense; or

**(ii)** the offense includes kidnapping or an attempt to

 1 - 3

U.S. Code § 249 - Hate crime acts | U.S. Code | US Law | LII...

https://www.law.cornell.edu/uscode/text/18/249

kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill.

## (2) OFFENSES INVOLVING ACTUAL OR PERCEIVED RELIGION, NATIONAL ORIGIN, GENDER, SEXUAL ORIENTATION, GENDER IDENTITY, OR DISABILITY.—

**(A)** In general.—Whoever, whether or not acting under color of law, in any circumstance described in subparagraph (B) or paragraph (3), willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person—

**(i)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and

**(ii)** shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if—

**(I)** death results from the offense; or

**(II)** the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill.

**(B)** Circumstances described.—For purposes of subparagraph (A), the circumstances described in this subparagraph are that—

**(i)** the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim—

2

**(I)** across a State line or national border; or

**(II)** using a channel, facility, or instrumentality of interstate or foreign commerce;

**(ii)** the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);

**(iii)** in connection with the conduct described in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or

**(iv)** the conduct described in subparagraph (A)—

**(I)** interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or

**(II)** otherwise affects interstate or foreign commerce.

LII  > U.S. Code  > Title 18. CRIMES AND CRIMINAL PROCEDURE
> Part I. CRIMES  > Chapter 13. CIVIL RIGHTS
> **Section 245. Federally protected activities**

# 18 U.S. Code § 245. Federally protected activities

U.S. Code        Notes

**(a)**

**(1)** Nothing in this section shall be construed as indicating
an intent on the part of Congress to prevent any State, any
possession or Commonwealth of the United States, or the
District of Columbia, from exercising jurisdiction over any
offense over which it would have jurisdiction in the absence
of this section, nor shall anything in this section be
construed as depriving State and local law enforcement
authorities of responsibility for prosecuting acts that may be
violations of this section and that are violations of State and
local law. No prosecution of any offense described in this
section shall be undertaken by the United States except
upon the certification in writing of the Attorney General, the
Deputy Attorney General, the Associate Attorney General, or
any Assistant Attorney General specially designated by the
Attorney General that in his judgment a prosecution by the
United States is in the public interest and necessary to



8 U.S. Code § 245 - Federally protected activities | U.S. Code ...

https://www.law.cornell.edu/uscode/text/18/245

secure substantial justice, which function of certification may not be delegated.

**(2)** Nothing in this subsection shall be construed to limit the authority of Federal officers, or a Federal grand jury, to investigate possible violations of this section.

**(b)** Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

**(1)** any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

**(A)** voting or qualifying to vote, qualifying or campaigning as a candidate for elective office, or qualifying or acting as a poll watcher, or any legally authorized election official, in any primary, special, or general election;

**(B)** participating in or enjoying any benefit, service, privilege, program, facility, or activity provided or administered by the United States;

**(C)** applying for or enjoying employment, or any perquisite thereof, by any agency of the United States;

**(D)** serving, or attending upon any court in connection with possible service, as a grand or petit juror in any court of the United States;

**(E)** participating in or enjoying the benefits of any program or activity receiving Federal financial assistance; or

**(2)** any person because of his race, color, religion or national origin and because he is or has been—

**(A)** enrolling in or attending any public school or public

college;

**(B)** participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;

**(C)** applying for or enjoying employment, or any perquisite thereof, by any private employer or any agency of any State or subdivision thereof, or joining or using the services or advantages of any labor organization, hiring hall, or employment agency;

**(D)** serving, or attending upon any court of any State in connection with possible service, as a grand or petit juror;

**(E)** traveling in or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor, rail, water, or air;

**(F)** enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public, or of any other establishment which serves the public and (i) which is located within the premises of any of the aforesaid establishments or within the premises of which is physically located any of the aforesaid establishments, and (ii) which holds itself out as serving patrons of such establishments; or

3

**(3)** during or incident to a riot or civil disorder, any person engaged in a business in commerce or affecting commerce, including, but not limited to, any person engaged in a business which sells or offers for sale to interstate travelers a substantial portion of the articles, commodities, or services which it sells or where a substantial portion of the articles or commodities which it sells or offers for sale have moved in commerce; or

**(4)** any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

> **(A)** participating, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1)(A) through (1)(E) or subparagraphs (2)(A) through (2)(F); or

> **(B)** affording another person or class of persons opportunity or protection to so participate; or

**(5)** any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1)(A) through (1)(E) or subparagraphs (2)(A) through (2)(F), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—

> shall be fined under this title, or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned not more than ten years, or both; and if death

4

results from the acts committed in violation of this section
or if such acts include kidnapping or an attempt to kidnap,
aggravated sexual abuse or an attempt to commit
aggravated sexual abuse, or an attempt to kill, shall be
fined under this title or imprisoned for any term of years or
for life, or both, or may be sentenced to death. As used in
this section, the term "participating lawfully in speech or
peaceful assembly" shall not mean the aiding, abetting, or
inciting of other persons to riot or to commit any act of
physical violence upon any individual or against any real or
personal property in furtherance of a riot. Nothing in
subparagraph (2)(F) or (4)(A) of this subsection shall apply
to the proprietor of any establishment which provides
lodging to transient guests, or to any employee acting on
behalf of such proprietor, with respect to the enjoyment of
the goods, services, facilities, privileges, advantages, or
accommodations of such establishment if such
establishment is located within a building which contains
not more than five rooms for rent or hire and which is
actually occupied by the proprietor as his residence.

**(c)** Nothing in this section shall be construed so as to deter any
law enforcement officer from lawfully carrying out the duties of
his office; and no law enforcement officer shall be considered to
be in violation of this section for lawfully carrying out the duties
of his office or lawfully enforcing ordinances and laws of the
United States, the District of Columbia, any of the several
States, or any political subdivision of a State. For purposes of
the preceding sentence, the term "law enforcement officer"
means any officer of the United States, the District of Columbia,
a State, or political subdivision of a State, who is empowered by
law to conduct investigations of, or make arrests because of,
offenses against the United States, the District of Columbia, a
State, or a political subdivision of a State.

**(d)** For purposes of this section, the term "State" includes a

# Rule 4.3 Dealing With Unrepresented Person - Comment

Share this:

f     🐦     in

*Transactions With Persons Other Than Clients*

[1] An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client. In order to avoid a misunderstanding, a lawyer will typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person. For misunderstandings that sometimes arise when a lawyer for an organization deals with an unrepresented constituent, see Rule 1.13(f).

[2] The Rule distinguishes between situations involving unrepresented persons whose interests may be adverse to those of the lawyer's client and those in which the person's interests are not in conflict with the client's. In the former situation, the possibility that the lawyer will compromise the unrepresented person's interests is so great that the Rule prohibits the giving of any advice, apart from the advice to obtain counsel. Whether a lawyer is giving impermissible advice may depend on the experience and sophistication of the unrepresented person, as well as the setting in which the behavior and comments occur. This Rule does not prohibit a lawyer from negotiating the terms of a transaction or settling a dispute with an unrepresented person. So long



# a menoradum to the court

As for me i'm 76 years old and in poor health.If you look in the *HEALTH* records  you will find.As for me in pro say i have to read up on every thing on my computer.As for attornys,i have had a few over the years but just like the city here there just here to get the money.So now that the cold weather is here,so days i don;t even get out of bed.So i hope the court under stand my situation so you'll have to bear whit me

1

GERALD EDWARDS

267 981 0209



## PULMONARY, CRITICAL CARE & SLEEP MEDICINE ASSOCIATES

BREATHE BETTER. LIVE BETTER. SLEEP BETTER.

# Summary of Today's Visit
**Edwards , Gerald  DOB:11/02/1944**
**Account No 9011248**
**Gender:Male**
**Race:White**
**Ethnicity:Not Hispanic or Latino**
**Preferred Language:English**
**11/13/2019 visit with Yusuf m. Khan, MD., FCCP**

### Reason for Visit

- Pulmonary evaluation requested by Allison Allen, CRNP

### Vitals

- HR 55 (/min)
- BP 130/65 (mm Hg)
- Ht 72 (in)
- Wt 255.6 (lbs)
- BMI 34.66 (Index)
- Oxygen sat % 97 (%)

### Allergies

- N.K.D.A.

### Today's Diagnoses Include

- J44.9    Chronic obstructive pulmonary disease, unspecified
- G47.33   Obstructive sleep apnea (adult) (pediatric)
- G47.00   Insomnia, unspecified

### Medication List

- Start Ambien : 10 MG 1 tablet at bedtime as needed Orally once a day,1 days ,1 Tablet ,Refills: 0

Notes: Encouraged diet, exercise and weight loss. The patient is at risk for sleep apnea. The patient will need a sleep study. We spoke about the diagnosis of sleep apnea and the risks of not treating it. Specifically cardiovascular disease associated with untreated sleep apnea like uncontrolled hypertension, coronary artery disease, pulmonary hypertension, strokes, and arrhythmias (the reoccurrence of atrial fibrillation). We discussed the different treatment options such as positive airway pressure, weight loss, oral appliance therapy and surgery. We also spoke about driving safety and not to drive or operate heavy machinery while sleepy.

### Tests Ordered/Performed Today

Labs

- CBC on 11/13/2019
- Alpha-1-Antitrypsin, Serum on 11/13/2019

Imaging Studies and Other Tests

- PSG on 11/13/2019
- PFT with DLCO on 11/13/2019
- CT Chest W/O Contrast on 11/13/2019

Summary of Today's Visit for - Edwards , Gerald   DOB:11/02/1944   Account No: 9011248
Pulm2 Crtical Care Sleep Med Assc PC   11 Friends Lane Suite 104 Newtown, PA 189401885   215-860-3630
*Summary generated by eClinicalWorks (www.eclinicalworks.com)*

*This document contains confidential information about your health. To maintain your privacy, do not throw this document in the trash. If you do not wish to keep this document for your records, please shred or otherwise securely dispose of your copy. If you are not the intended recipient, please destroy this document and report it to the physician's office named above.*

## ther Medical Conditions (Problem List)

- G47.30  Sleep apnea, unspecified
- J44.9  Chronic obstructive pulmonary disease, unspecified
- G47.33  Obstructive sleep apnea (adult) (pediatric)
- G47.00  Insomnia, unspecified

## Preventive Medicine

- Counseling:

Ostructive Sleep Apnea  -  1. Talk with your Physician if you have symptoms of obstructive sleep apnea 2. Ask people who are around you when you sleep if they have heardloud snoring, or saw you have apnea spells. 3. Ask your Physician if you need a sleep study. 4. Excercise regularly and work to lose weight if you are oveweight. 5. Avoid alcohol, particularly just prior to sleep..

Weight Counseling:  -  BMI management provided: Yes

Diet:  -  .

Exercise:  -  .

Hand outs:  -  Obstructive sleep apnea.

Health:  -  .

## Smoking Status

- former smoker

## Your Next Appointment(s)

- Thu, 14 Nov 2019 at 11:15 AM with Yusuf m. Khan, MD., FCCP at Pulm2 Crtical Care Sleep Med Assc PC 11 Friends Lane Suite 104 Newtown, PA 189401885 Phone: 215-860-3630 (Reason: PFT)
- Thu, 21 Nov 2019 at 08:00 PM with Yusuf m. Khan, MD., FCCP at Pulm2 Crtical Care Sleep Med Assc PC 11 Friends Lane Suite 104 Newtown, PA 189401885 Phone: 215-860-3630 (Reason: PSG NO AUTH REQ)
- Wed, 11 Dec 2019 at 12:00 PM with Yusuf m. Khan, MD., FCCP at Pulm2 Crtical Care Sleep Med Assc PC 11 Friends Lane Suite 104 Newtown, PA 189401885 Phone: 215-860-3630 (Reason: pft, psg f/u)

Summary of Today's Visit for - Edwards , Gerald  DOB:11/02/1944  Account No: 9011248
Pulm2 Crtical Care Sleep Med Assc PC   11 Friends Lane  Suite 104  Newtown, PA 189401885   215-860-3630
Summary generated by eClinicalWorks (www.eclinicalworks.com)

*This document contains confidential information about your health. To maintain your privacy, do not throw this document in the trash. If you do not wish to keep this document for your records, please shred or otherwise securely dispose of your copy. If you are not the intended recipient, please destroy this document and report it to the physician's office named above.*

Yusuf m. Khan, MD., FCCP
Pulmonary Diseases

PRINTED PRESCRIPTION

Edwards, Gerald

Date: 11/13/2019

2076 County Line Rd Apt 159, Huntington Valley, PA-19006
DOB: 11/02/1944, Phone: 267-981-0709

*Rx*

Ambien  Tablet 10 MG Orally
Disp: ***1 Tablet*** (ONE )
Sig:  1 tablet at bedtime as needed Once a day 1 days
Diagnosis: (G47.00) Insomnia, unspecified

Refills: ***0*** (ZERO)
Auth No:
DEA #:  BK1673690
NPI #:  1962424655
LIC.#:  MD039495L

To ensure brand name dispensing, prescriber must write "Dispense as Written" or
"D.A.W" on the prescription.

Yusuf m. Khan, MD., FCCP,

*3-*

Req/Ctrl# (CD-): 171236

**Yusuf m. Khan, MD., FCCP**
NPI: 1962424655
Pulmonary Diseases

im2 Crtical Care Sleep Med Assc PC

11 Friends Lane, Suite 104
Newtown, PA, 189401885

📞 215-860-3630  📠 215-579-2199

---

**dwards, Gerald, Male, 11/02/1944**  ID: 9011248

📞 267-981-0709  📍 2076 County Line Rd Apt 159, Huntington Valley, PA, US 19006

Today: 11/13/2019  04:43 PM
Order Date: 11/13/2019  12:15 AM

ary Insurance Name: Medicare Part B Carriers
ance Address: PO Box 3418 , Mechanicsburg , PA , 170551854
criber Number: 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A
ed Name: Edwards, Gerald
ress: 2076 County Line Rd Apt 159, Huntington Valley, PA, US 19006

| | Fast | Assessment(s) |
|---|---|---|
| ipha-1-Antitrypsin, Serum | No | - J44.9,  Chronic obstructive pulmonary disease, unspecified<br>- G47.33,  Obstructive sleep apnea (adult) (pediatric) |
| 3C | No | - J44.9,  Chronic obstructive pulmonary disease, unspecified<br>- G47.33,  Obstructive sleep apnea (adult) (pediatric) |

*Yusuf Khan, MD*

ctronically Signed By: Yusuf
Khan, MD., FCCP

Signature of Patient/Guardian

der generated by
linicalWorks
www.eclinicalworks.com)

Edwards, Gerald, 11/02/1944

4

**ST MARY MEDICAL CENTER**
**PRIMARY**

Edwards, Gerald
DOB: 11/2/1944 M74
Wt/Ht: 114.60 Kg 182.88 cm.
MedRec: 3774732
AcctNum: LP0335707857

*PREVIOUS VISIT ALLERGIES:* No Known Allergies. (Thu Apr 11, 2019 10:58 NLQG)
   No Known Allergies. (11:24 NJM3)

## PAST MEDICAL HISTORY

*PROVIDER ALERT:* Nursing history reviewed and agreed up to this time in documentation,
   except were noted. (11:37 SCRF)
*MEDICAL HISTORY:* **Past medical history includes skin history, eczema, Flu vaccine not
   up to date, Tetanus not up to date, Past medical history includes pulmonary disease, emphysema.
   hard of hearing.** (11:24 NJM3)
*SURGICAL HISTORY:* **Patient has no surgical history.** (11:24 NJM3)
*PSYCHIATRIC HISTORY:* **No previous psychiatric history.** (11:24 NJM3)
*SOCIAL HISTORY:* **Patient is a former tobacco user, smoked cigarettes,** Patient
   quit smoking more than 10 years ago, **Patient denies alcohol use, Patient denies drug use, Lives
   at home, alone.** (11:24 NJM3)
*FAMILY HISTORY:* **Family history reviewed and not relevant, FHx reviewed, Family history
   reviewed and not relevant, Family history reviewed.** (11:24 NJM3)
   Family Hx reviewed. (11:37 SCRF)
*NOTES:* Nursing history reviewed and agreed up to this time in documentation, except were
   noted. (11:37 SCRF)

## CURRENT MEDICATIONS (11:20 NJM3)

*Med History Denied*
*Med and Allergy History from Patient*

## NURSING ASSESSMENT: DENTAL (11:20 NJM3)

*CONSTITUTIONAL:* Patient cooperative, Patient alert, Oriented to person, place and time,
   Skin warm, Skin dry, Skin normal in color, Mucous membranes pink, Mucous membranes moist, Gait
   steady, History obtained from patient, Patient appears comfortable.
*PAIN:* Patient rates pain as 0 out of 10.
*DENTAL:* **Teeth abnormal:, gums tender, right lower,** Notes: **Pt missing most
   teeth, swelling and redness just posterior to right lower tooth. Pt reports discomfort began about a
   month ago.**
*SAFETY:* Side rails up, Cart/Stretcher in lowest position, Call light within reach, Hospital ID
   band on.

## NURSING ASSESSMENT: NEURO

*NEURO:* Pupils equally round and reactive to light, Able to close eyes, Face symmetrical,
   Speech normal, GCS:, Eye opening: (4) – Spontaneous, Verbal: (5) – Oriented/conversive,
   Motor: (6) – Obeys commands/Spontaneous, GCS Total: **15,** Hand grasps equal, Upper
   extremity strength strong, Foot press equal, Lower extremity strength strong, **Associated with
   dizziness described as, feeling unsteady,** Notes: **PT complains to MD feeling
   intermittently dizzy.** (11:45 NJM3)
   Pupils equally round and reactive to light, Able to close eyes, Face symmetrical, Speech normal,
   GCS:, Eye opening: (4) – Spontaneous, Verbal: (5) – Oriented/conversive, Motor: (6) – Obeys
   commands/Spontaneous, GCS Total: **15,** Hand grasps equal, Upper extremity strength strong,
   Foot press equal, Lower extremity strength strong, **Associated with dizziness described as,
   feeling unsteady,** Notes: **Pt watching TV, no distress noted.** (12:45 NJM3)
   Pupils equally round and reactive to light, Able to close eyes, Face symmetrical, Speech normal,
   GCS:, Eye opening: (4) – Spontaneous, Verbal: (5) – Oriented/conversive, Motor: (6) – Obeys
   commands/Spontaneous, GCS Total: **15,** Hand grasps equal, Upper extremity strength strong,
   Foot press equal, Lower extremity strength strong, Notes: **Pt awaits social work, no complaints
   offered.** (13:45 NJM3)
*ENT:* Nasal assessment findings include nose normal to inspection, Sinuses normal, Nasal
   mucosa normal, Mouth and throat assessment findings include mouth inspection normal, Mucous

**EDWARDS, GERALD (id #387563, dob: 11/02/1944)**

- DIZZINESS: CARE INSTRUCTIONS

**5. Retention of urine** - History of urinary retention s/p catheterization and flomax. Pt no longer taking flomax and denies any symptoms.
R33.9: Retention of urine, unspecified
- URINARY RETENTION: CARE INSTRUCTIONS

**6. Reduced visual acuity** - referral provided.
H54.7: Unspecified visual loss
- OPHTHALMOLOGY REFERRAL -     Schedule Within: provider's discretion

**7. Nocturia** - Check PSA.
R35.1: Nocturia
- PSA, SERUM OR PLASMA

**8. History of emphysema** - Stable. Has never followed with specialist. Reports use of an inhaler at some time, but no longer requiring. Will continue to monitor.
Z87.09: Personal history of other diseases of the respiratory system

**9. At risk for falls** - STEADI 6/14: Pt not currently taking any medications. Will continue to monitor symptoms.
Z91.81: History of falling

**10. Screening for malignant neoplasm of colon** - recommended screening - give colonoscopy referral.
Z12.11: Encounter for screening for malignant neoplasm of colon
- COLONOSCOPY REFERRAL -     Schedule Within: provider's discretion

**11. Body mass index 30+ - obesity** - Encouraged healthy diet and exercise habits.
Z68.34: Body mass index (BMI) 34.0-34.9, adult
- A HEALTHY LIFESTYLE: CARE INSTRUCTIONS
- BODY MASS INDEX: CARE INSTRUCTIONS
- LEARNING ABOUT HEALTHY WEIGHT
- LIPID PANEL
Fasting: Y

**Goals**

Return to Office
- Allison Allen, CRNP for Established Patient 45 at SMPG_St Mary Health Main Campus on 09/04/2019 at 09:30 AM

Encounter Sign-Off
Encounter signed-off by Allison Allen, CRNP, 06/04/2019.

Encounter performed and documented by Allison Allen, CRNP
Encounter reviewed & signed by Allison Allen, CRNP on 06/04/2019 at 6:53pm

Screening:     PHQ-2/PHQ-9   GAD-7   STEADI Fall Risk

20

## Patient

| | | | |
|---|---|---|---|
| Name | EDWARDS, GERALD (74yo, M) ID# 387563 | Appt. Date/Time | 06/04/2019 01:45PM |
| DOB | 11/02/1944 | Service Dept. | SMPG_St Mary Health Main Campus |
| Provider | ALLISON ALLEN, CRNP | | |
| Insurance | Med Primary: MEDICARE-PA (MEDICARE) Insurance # : 196345404A Prescription: OPTUMRX - Member is eligible. | | |

## Chief Complaint

new patient

Patient is here today to get established. He was in the ER on April 11th, 2019. He was never admitted. He was there for dizziness.

## Patient's Pharmacies

**ST. CLARE PHARMACY (ERX): 1203 LANGHORNE NEWTOWN RD, LANGHORNE PA 19047, Ph (215) 710-7427, Fax (215) 710-7434**

## Vitals

| | | | | | |
|---|---|---|---|---|---|
| Ht: | 6 ft Standing | Wt: | 250 lbs 8 oz With clothes | BMI: | 34 |
| BP: | 118/72 sitting R arm | Pulse: | 66 bpm regular | T: | 97.7 F° ear |
| O2Sat: | 98% Room Air at Rest | | | | |

## Measurements

None recorded.

## Allergies

Reviewed Allergies
NKDA

## Medications

No medications reported

## Problems

Reviewed Problems

## Family History

Reviewed Family History

## Social History

Reviewed Social History
**Adult General**
***ABUSE*** last updated: 06/04/2019
Date Previous Abuse Screening Performed:: 06/04/2019
Have you ever been emotionally or physically abused by your partner, caregive or someone important to you?: No
Within the past year, have you been hit, kicked or otherwise physically hurt by someone?: No
Within the last year, has anyone forced you to have sexual activity?: No
Are you afraid of your partner, caregiver or anyone else?: No
Clinician/Family believes neglect, abuse, or exploitation may exist:: N
***AMBULATORY*** last updated: 06/04/2019
Is the patient ambulatory?: Yes: walks without restrictions
***TOBACCO (Smoking/Smokeless)*** last updated: 06/04/2019
Smoking Status: Former smoker
What type of smoking product used?: Cigarette
Smoker (1/2 PPD)
Has smoked since age: 18
Smokeless tobacco status?: Never user



**Name:** Edwards, Gerald
Age: 74Y DOB: Nov 02, 1944
Gender: M Wt: 114.60 kg Ht: 182.88 cm
MedRec: 3774732
AcctNum: LP0335707857
Attending: PJT
Primary RN: NJM3
Bed: ED 2V 10

# ST MARY MEDICAL CENTER
# DISCHARGE INSTRUCTIONS

up with your doctor if your symptoms continue.

HOME CARE:

1) If a dizzy spell occurs and lasts more than a few seconds, lie down until it passes. If you are lying down, then you cannot hurt yourself by falling if you do faint.

2) Do not drive or operate dangerous equipment until the dizzy spells have stopped for at least 48 hours.

3) If dizzy spells occur with sudden standing, this may be a sign of mild dehydration. Drink extra fluids over the next few days.

4) If you recently started a new medicine or if you had the dose of a current medicine increased (especially blood pressure medicine), talk with the prescribing doctor about your symptoms. Dose adjustments may be needed.

FOLLOW UP with your doctor for further evaluation within the next seven days, if your symptoms continue.

GET PROMPT MEDICAL ATTENTION if any of the following occur:

-- Worsening of your symptoms

-- Fainting, headache or seizure

-- Repeated vomiting

-- Feeling like you or the room is spinning

-- Chest, arm, neck, back or jaw pain

-- Palpitations (the sense that your heart is fluttering or beating fast or hard)

-- Shortness of breath

-- Blood in vomit or stool (black or red color)

-- Weakness of an arm or leg or one side of the face

-- Difficulty with speech or vision

© 2000-2011 Krames StayWell, 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical



Name: Edwards, Gerald
Age: 74Y DOB: Nov 02, 1944
Gender: M  Wt: 114.60 kg  Ht: 182.88 cm
MedRec: 3774732
AcctNum: LP0335707857
Attending: PJT
Primary RN: NJM3
Bed: ED 2V 10

# ST MARY MEDICAL CENTER
# DISCHARGE INSTRUCTIONS

The tooth pain may be made worse by drinking hot or cold fluids. It may spread from
the tooth to the ear or jaw on the same side.

HOME CARE:
Avoid hot and cold foods, and liquids since your tooth may be sensitive to
temperature changes.
If your tooth is chipped or cracked, or if there is a large open cavity, apply OIL OF
CLOVES (available over-the-counter in drug stores) directly to the tooth to reduce
pain. Some pharmacies carry an over-the-counter "toothache kit." This contains oil of
cloves and a paste, which can be applied over the exposed tooth to decrease
sensitivity.
An ice pack on your jaw over the sore area may help to reduce pain.
You may use acetaminophen (Tylenol) or ibuprofen (Motrin, Advil) to control pain,
unless another pain medicine was prescribed. [ NOTE: If you have liver disease or
ever had a stomach ulcer, talk with your doctor before using these medicines.]
If you have signs of an infection, an antibiotic will be given. Take it as directed.

FOLLOW-UP with your dentist as directed. Although your pain may go away with the
treatment given, only a dentist can fully evaluate and treat this problem to prevent
further tooth damage.

GET PROMPT MEDICAL ATTENTION if any of the following occur:
Redness or swelling of the face
Pain worsens or spreads to the neck
Fever over 100.5 °F (38°C)
Unusual drowsiness; headache or stiff neck; weakness or fainting
Pus drains from the tooth or gum
Difficulty swallowing or breathing

© 2000-2011 Krames StayWell, 780 Township Line Road, Yardley, PA 19067. All rights
reserved. This information is not intended as a substitute for professional medical
care. Always follow your healthcare professional's instructions.

### DIZZINESS, UNK CAUSE
DIZZINESS [Uncertain cause]

Dizziness is a common symptom sometimes described as "lightheadedness" or feeling
like you are going to faint. If it lasts for only a few seconds and is related to
changes in position (such as getting up after lying or sitting for a long time), it
is usually not a sign of anything serious. Dizziness that lasts for minutes to hours,
or comes on for no apparent reason, may be a sign of a more serious problem (such as
dehydration, a medicine reaction, disease of the heart or brain).

Today's exam did not show an exact cause for your dizzy spell . Sometimes additional
tests are required before a cause can be found. Therefore, it is important to follow

2x



Name: Edwards, Gerald
Age: 74Y DOB: Nov 02, 1944
Gender: M  Wt: 114.60 kg  Ht: 182.88 cm
MedRec: 3774732
AcctNum: LP0335707857
Attending: PJT
Primary RN: NJM3
Bed: ED 2V 10

# ST MARY MEDICAL CENTER
# DISCHARGE INSTRUCTIONS

care. Always follow your healthcare professional's instructions.

## PRESCRIPTIONS (1)

Printed (1)

Augmentin : tablet : 875 mg–125 mg : ORAL
Quantity: 1, Unit: tab(s), Route: ORAL, Schedule: 2 times a day, Dispense: 20
      Unit: tab(s)

3x



Name: Edwards, Gerald
Age: 74Y DOB: Nov 02, 1944
Gender: M  Wt: 114.60 kg  Ht: 182.88 cm
MedRec: 3774732
AcctNum: LP0335707857
Attending: PJT
Primary RN: NJM3
Bed: ED 2V 10

# ST MARY MEDICAL CENTER
# PROCEDURES AND TESTS

You were seen in the Emergency Department on: Thu Apr 11, 2019

**PROCEDURES PERFORMED**
No Information Available

**TESTS PERFORMED**
CARDIAC TROPONIN I
CBC with DIFF
Chest – 1 View
COMPREHENSIVE METABOLIC PANEL
Electrocardiogram
MAGNESIUM
Social Service Consult
Vital Signs – Orthostatic

4x



**Name: Edwards, Gerald**
Age: 74Y DOB: Nov 02, 1944
Gender: M  Wt: 114.60 kg  Ht: 182.88 cm
MedRec: 3774732
AcctNum: LP0335707857
Attending: PJT
Primary RN: NJM3
Bed: ED 2V 10

# ST MARY MEDICAL CENTER
# DISCHARGE INSTRUCTIONS

in Bucks County.

## FINAL DIAGNOSIS
decayed tooth

## ADDITIONAL DIAGNOSIS
Dental infection
Dizziness

## TREATED BY:
Attending Physician - Torradas Md, Jose
Primary Nurse(s)  - Maurstad, Julie; Burandt, Melissa

## FOLLOWUP CONTACTS

NONE, DOCTOR M, Medicine Family Practice
1205 LANGHORNE-NEWTOWN ROAD
LANGHORNE
LANGHORNE PA

TORRADAS, JOSE R, Medicine Emergency
1201 LANGHORNE-NEWTOWN ROAD
LANGHORNE
LANGHORNE PA
 Phone: (215)710-2100

## SPECIAL INSTRUCTIONS
Please follow up with outpatient physician this week for outpatient evaluation and
long term care.  We recommend follow up with local dentist for likely extraction of
your tooth and continued care.  Augmentin twice a day has been prescribed for tooth
infection.  Important to stay well hydrated and eat regular meals.  Return to the
ER for any acute or worsening symptoms for which you feel you need to be evaluated
emergently.

## MEDICAL INSTRUCTIONS

### CAVITY DENTAL
DENTAL CAVITY

A dental cavity is a pit or crater in the enamel surface of the tooth. This exposes
the sensitive inner layer of the tooth and causes pain. If untreated, the cavity will
get bigger and may cause an infection or abscess in the root of the tooth. An
infection in the tooth is a much more serious problem and may require a root canal or
removal of the entire tooth.

5×

# EDWARDS, GERALD (id #387563, dob: 11/02/1944)

### Patient

| | | | |
|---|---|---|---|
| **Name** | EDWARDS, GERALD (74yo, M) ID# 387563 | **Appt. Date/Time** | 06/04/2019 01:45PM |
| **DOB** | 11/02/1944 | **Service Dept.** | SMPG_St Mary Health Main Campus |
| **Provider** | ALLISON ALLEN, CRNP | | |
| **Insurance** | Med Primary: MEDICARE-PA (MEDICARE) Insurance # : 196345404A Prescription: OPTUMRX - Member is eligible. | | |

### Chief Complaint

new patient

Patient is here today to get established. He was in the ER on April 11th, 2019. He was never admitted. He was there for dizziness.

### Patient's Pharmacies

**ST. CLARE PHARMACY (ERX): 1203 LANGHORNE NEWTOWN RD, LANGHORNE PA 19047, Ph (215) 710-7427, Fax (215) 710-7434**

### Vitals

| | | | | | |
|---|---|---|---|---|---|
| **Ht:** | 6 ft Standing 06/04/2019 01:59 pm | **Wt:** | 250 lbs 8 oz With clothes 06/04/2019 01:51 pm | **BMI:** | 34 06/04/2019 01:51 pm |
| **BP:** | 118/72 sitting R arm 06/04/2019 02:00 pm | **Pulse:** | 66 bpm regular 06/04/2019 02:00 pm | **T:** | 97.7 F° ear 06/04/2019 02:00 pm |
| **O2Sat:** | 98% Room Air at Rest 06/04/2019 01:55 pm | | | | |

### Measurements

None recorded.

### Allergies

Reviewed Allergies
NKDA

### Medications

No medications reported

### Problems

Reviewed Problems

### Family History

Reviewed Family History

### Social History

Reviewed Social History
**Adult General**
***ABUSE*** last updated: 06/04/2019
Date Previous Abuse Screening Performed:: 06/04/2019
Have you ever been emotionally or physically abused by your partner, caregive or someone important to you?: No
Within the past year, have you been hit, kicked or otherwise physically hurt by someone?: No
Within the last year, has anyone forced you to have sexual activity?: No
Are you afraid of your partner, caregiver or anyone else?: No
Clinician/Family believes neglect, abuse, or exploitation may exist:: N
***AMBULATORY*** last updated: 06/04/2019
Is the patient ambulatory?: Yes: walks without restrictions
***TOBACCO (Smoking/Smokeless)*** last updated: 06/04/2019
Smoking Status: Former smoker
What type of smoking product used?: Cigarette
Smoker (1/2 PPD)
Has smoked since age: 18
Smokeless tobacco status?: Never user

## EDWARDS, GERALD (id #387563, dob: 11/02/1944)

PMH: Urinary retention, emphysema
Labs: only at the ER
specialists: Urology: Dr. Bickell ( no longer following)
Vaccines: none
PSA: none
Colonoscopy: none
diet/exercise: Cooking everything fresh, sometimes canned food - he works on houses - has rentals in the city
social: no family

ER in april for tooth decay and dizziness. EKG and ortho statics WNL
Exam notable for dysarthria, aphasia, and lipoma on his leg.

No PCP: Going to the ER with any medical concerns
taking a lot of supplements - iodine ?

Fatigue increasing over 3 years after dx with emphysema
Dizziness started this past winter. Intermittent. Room spins.
Chest pain started in the winter- has not had in months

ROS

Patient reports **lack of energy** but reports no fever. He reports **chest pain** but reports no palpitations. He reports **shortness of breath**. He reports **dizziness**. He reports no vision change. He reports no difficulty hearing. He reports no nausea, no vomiting, and no diarrhea. He reports no muscle aches and no muscle weakness. He reports no depression and no anxiety.

Physical Exam

Patient is a 74-year-old male.

**Constitutional:** General Appearance: healthy-appearing, well-developed, and **obese**. Level of Distress: NAD. Ambulation: ambulating normally.

**Psychiatric:** Insight: **poor insight**. Mental Status: normal mood and affect and active and alert.

**Head:** Head: normocephalic and atraumatic.

**Eyes:** Lids and Conjunctivae: non-injected and no discharge. Pupils: PERRLA. EOM: EOMI.

**ENMT:** Ears: no lesions on external ear, EACs clear, and TMs clear. Lips, Teeth, and Gums: no mouth or lip ulcers or bleeding gums and **poor dentition**. Oropharynx: no erythema or exudates and moist mucous membranes.

**Neck:** Neck: supple, trachea midline, and no masses. Lymph Nodes: no cervical LAD.

**Lungs:** Respiratory effort: no dyspnea. Auscultation: no wheezing, rales/crackles, or rhonchi and breath sounds normal and good air movement.

**Cardiovascular:** Heart Auscultation: normal S1 and S2; no murmurs, rubs, or gallops; and RRR. Pulses including femoral / pedal: **+2 radial pulse.**

**Abdomen:** Bowel Sounds: normal. Inspection and Palpation: no tenderness or guarding and soft and non-distended.

**Musculoskeletal::** Joints, Bones, and Muscles: normal movement of all extremities.

**Neurologic:** Gait and Station: normal gait and station.

Assessment / Plan

1. **Adult health examination** - Pt is not following with any specialities. He needs updated screening measures and lab work.
   Z00.00: Encounter for general adult medical examination without abnormal findings

2. **Dental caries** - Needs teeth removed. Give referral.
   K02.9: Dental caries, unspecified
   • TOOTH DECAY: CARE INSTRUCTIONS
   • DENTAL REFERRAL -      Schedule Within: provider's discretion

3. **Fatigue** - Check labs and follow up in 3 months.
   R53.83: Other fatigue
   • CBC WITH DIFFERENTIAL
   • TSH + FREE T4, SERUM
   • COMPREHENSIVE METABOLIC PANEL

4. **Dizziness** - Workup inpatient WNL. Will check labs and continue to monitor.
   R42: Dizziness and giddiness

symptoms.
R33.9: Retention of urine, unspecified
- URINARY RETENTION: CARE INSTRUCTIONS

**6. Reduced visual acuity** - referral provided.
H54.7: Unspecified visual loss
- OPHTHALMOLOGY REFERRAL -    Schedule Within: provider's discretion

**7. Nocturia** - Check PSA.
R35.1: Nocturia
- PSA, SERUM OR PLASMA

**8. History of emphysema** - Stable. Has never followed with specialist. Reports use of an inhaler at some time, but no longer requiring. Will continue to monitor.
Z87.09: Personal history of other diseases of the respiratory system

**9. At risk for falls** - STEADI 6/14: Pt not currently taking any medications. Will continue to monitor symptoms.
Z91.81: History of falling

**10. Screening for malignant neoplasm of colon** - recommended screening - give colonoscopy referral.
Z12.11: Encounter for screening for malignant neoplasm of colon
- COLONOSCOPY REFERRAL -    Schedule Within: provider's discretion

**11. Body mass index 30+ - obesity** - Encouraged healthy diet and exercise habits.
Z68.34: Body mass index (BMI) 34.0-34.9, adult
- A HEALTHY LIFESTYLE: CARE INSTRUCTIONS
- BODY MASS INDEX: CARE INSTRUCTIONS
- LEARNING ABOUT HEALTHY WEIGHT
- LIPID PANEL
   Fasting: Y


**Goals**


Return to Office
- Allison Allen, CRNP for Established Patient 45 at SMPG_St Mary Health Main Campus on 09/04/2019 at 09:30 AM

Encounter Sign-Off
Encounter signed-off by Allison Allen, CRNP, 06/04/2019.

Encounter performed and documented by Allison Allen, CRNP
Encounter reviewed & signed by Allison Allen, CRNP on 06/04/2019 at 6:53pm


Screening:     PHQ-2/PHQ-9   GAD-7   STEADI Fall Risk



LPS Bucks County Family Medicine
1205 Langhorne-Newtown Rd Suite 102
LANGHORNE, PA 19047-1219
Phone: (215) 710-2633, Fax: (215) 710--2638

**Return to Work / School**

**Patient:** EDWARDS, GERALD                    **Date:** 11/08/2019
**DOB:** 11/02/1944                              **Patient ID:** 387563
**Address:** 7155 TULIP ST
PHILADELPHIA, PA 19135-1429

Note to patient:

✓ Was seen in my office on: _11/8/2019_

✓ May return to work/school on: _11/11/19_

____ May not return to work/school on: _____

____ Work limitations: _____

____ May not participate in physical education: _____

____ May return to physical education: _____

____ Limitations for physical education: _____

____ May not participate in jury duty: _____

Sincerely,

_A. Allen, CRNP_



LPS Bucks County Family Medicine
1205 Langhorne-Newtown Rd Suite 102
LANGHORNE, PA 19047-1219
Phone: (215) 710-2633, Fax: (215) 710--2638

**Return to Work / School**

**Patient:** EDWARDS, GERALD                    **Date:** 12/17/2019
**DOB:** 11/02/1944                             **Patient ID:** 387563
**Address:** 7155 TULIP ST
PHILADELPHIA, PA 19135-1429

Note to patient:

_✓_   Was seen in my office on: ___12/17/19_____

___   May return to work/school on: _____

___   May not return to work/school on: _____

___   Work limitations: _____

___   May not participate in physical education:_____

___   May return to physical education: _____

___   Limitations for physical education: _____

___   May not participate in jury duty:_____

Sincerely,

*a. allen, CRNP*

# Trinity Health Mid-Atlantic | St. Mary Physicians Group

LPS Bucks County Family Medicine
1205 Langhorne-Newtown Rd Suite 102
LANGHORNE, PA 19047-1219
Phone: (215) 710-2633, Fax: (215) 710--2638

## Return to Work / School

**Patient:** EDWARDS, GERALD
**DOB:** 11/02/1944
**Address:** 7155 TULIP ST
PHILADELPHIA, PA 19135-1429

**Date:** 12/17/2019
**Patient ID:** 387563

Note to patient:

✓ Was seen in my office on: _____ 11/24/19 _____

____ May return to work/school on: _____

____ May not return to work/school on: _____

____ Work limitations: _____

____ May not participate in physical education: _____

____ May return to physical education: _____

____ Limitations for physical education: _____

____ May not participate in jury duty: _____

Sincerely,

St. Mary Health Main Campus
1205 Langhorne-Newtown Road, Suite 102
Langhorne, PA 19047
## Phone: 215-710-2633
## Fax: 215-710-2638

# Lab Order
12/17/2019

**Order To**

ST MARY MEDICAL CENTER (SMMC LAB) [ 235 ]

1201 LANGHORNE-NEWTOWN RD
LANGHORNE, PA 19047

Phone: (215) 710-2164

Fax: (215) 710-5007

**Ordering Provider**

ALLISON ALLEN, CRNP
SMPG_St Mary Health Main Campus
1205 Langhorne-Newtown Rd Suite 102
LANGHORNE, PA 19047-1219
Phone: (215) 710-2633
Fax: (215) 710--2638

**Order**

Orders included: 4

Fatigue | ICD-10: R53.83: Other fatigue
- CMP | comprehensive metabolic panel | BILL: Third Party
- CBCND | CBC no differential | BILL: Third Party
- TSH | TSH | BILL: Third Party

Body mass index 30+ - obesity | ICD-10: Z68.35: Body mass index (BMI) 35.0-35.9, adult
- LPP | lipid panel | BILL: Third Party

*fasting (months)* [handwritten]

Fasting: Y

| | |
|---|---|
| Patient Name | EDWARDS, GERALD |
| Sex - DOB - Age | M 11/02/1944 75yo |
| Address | 7155 TULIP ST<br>PHILADELPHIA, PA 19135-1429 |
| Phone | h: (267) 226-9709 w: |
| Insurance | Primary Insurance:MEDICARE-PA (MEDICARE)<br>Secondary Insurance: |
| Drawn by | |
| Date/Time Drawn | |
| Fasting?: | - None Needed<br>- 8 HR<br>- 12 HR |
| Other/Notes | |
| CC | |

Electronically Signed by: ALLISON ALLEN, CRNP

12/17/2019 9:58am
ALLISON ALLEN, CRNP

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____1659 Ramble Road, Langhorne, PA 19047_____

Address of Defendant: _____

Place of Accident, Incident or Transaction: _____Bucks_____

---

**RELATED CASE, IF ANY:**

Case Number: __19 - 5806__     Judge: __Pratter__     Date Terminated: __12 / 13 / 19__

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐     No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☐     No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐     No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐     No ☐

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __01/13/2020__     __Daniel McConel__
                           *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☑ 7. Civil Rights     550
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
     *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
     *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or pro se plaintiff,* do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _____     _____          _____
                           *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

GEKP

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

Edwards                                    :          CIVIL ACTION
                                           :
                    v.                     :
                                           :          NO. **2 0      3 0 7**
Hessenthaler, et. al.                      :

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.            (   )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human
     Services denying plaintiff Social Security Benefits.                           (   )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  (   )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.                                                          (   )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.                                                              (   )

(f) Standard Management – Cases that do not fall into any one of the other tracks.  **550** (☒)


JAN 1 3 2020              *David McConnel*            _____
_____   _____
**Date**                  **Deputy Clerk**            **Attorney for**


_____   _____    _____
**Telephone**             **FAX Number**              **E-Mail Address**


(Civ. 660) 10/02

ER AT TOP OF ENVELOPE TO THE RIGHT
URN ADDRESS, FOLD AT DOTTED LINE
TIFIED MAIL®

290 0001 9834 4484



U.S. POSTAGE PAID
FCM LG ENV
FEASTERVILLE TREVOSE, PA
19053
JAN 09, 20
AMOUNT
**$8.95**
R2303S102906-36

1000          19106

UNITED STATES
POSTAL SERVICE®

U.S.M.S.
X-RAY

Federal Court Eastern Div.

ket St.

9/06

GERALD EDWARDS
1659 Ramble Rd.
LANGHORNE
Pa 19047

PLACE STIC
OF THE RE
CEI

7018 2

U.S. Dis.
601 Mar
Phila Pa, 1